**Gary I. YORK, Appellant,**

v.

**BURGESS–NORTON MANUFACTURING COMPANY, Own Risk and the Workers' Compensation Court, Appellees.**

**No. 70766.**

Supreme Court of Oklahoma.

Dec. 18, 1990.

Richard A. Bell, Norman, for appellant,

Paul V. McGivern, Jr., Daniel L. Crawford, McGivern, Scott, Gilliard, McGivern & Robinson, Tulsa, for appellees.

SUMMERS, Justice.

This Workers' Compensation case presents as its principal issue the non-compliance of a medical report with the *Guides to the Evaluation of Permanent Impairment (Guides)*, adopted and published by the American Medical Association. The employer's doctor disregarded inconsistent test results showing pulmonary impairment, and determined instead that the claimant had no such impairment. We find that the employer's doctor could disregard the inconsistent results, but in so doing was required to perform an additional test before finding that the claimant was not impaired.

In a secondary issue we find, contrary to the holding of the trial judge, that the claimant's medical testimony constituted competent evidence of impairment.

York filed a claim on June 4, 1987, alleging that he had sustained an employment-related injury to his lungs and upper respiratory system. The trial judge found that York did not sustain an accidental personal injury arising out of and in the course of employment. The trial judge also found that the claimant's medical evidence was not competent to sustain any finding of occupational disease and thus claimant did not meet his burden of proof. The claimant appealed.

In an unpublished opinion the Court of Appeals found that the report of the employer's doctor was erroneously admitted, and that the report of the claimant's doctor was competent evidence of impairment. It remanded the cause with directions to enter an order awarding the claimant compensation on the basis of the only competent evidence, that is, the claimant's. The employer petitioned for certiorari and the writ was previously granted. We vacate the opinion of the Court of Appeals, reverse the order of the compensation court, and remand for further proceedings.

## I. Employer's evidence.

■ Our standard of review in workers' compensation cases is to determine whether the order of the compensation court is supported by any competent evidence. *Parks v. Norman Municipal Hospital,* 684 P.2d 548 (Okla.1984). The first issue involves the opinion of the employer's doctor and his assertion that his opinion deviated

from the *Guides.* The relevant[1] statute states in part:

> ·Except as otherwise provided herein, *any examining physician shall only evaluate impairment in accordance with the latest 'Guides to the Evaluation of Permanent Impairment'* adopted and published by the American Medical Association. *The examining physician shall not deviate from said guides except as may be specifically provided for in the guides.* These officially adopted guides shall be the exclusive basis for testimony and conclusions with regard to permanent impairment with the exception of paragraph 3 of Section 22 of this title, relating to scheduled member injury or loss; and impairment, including pain or loss of strength, may be awarded with respect to those injuries or areas of the body not specifically covered by said guides." 85 O.S.Supp.1986, § 3(11). (Emphasis added).

This statute states plainly that a physician must evaluate impairment according to the *Guides.*[2] An impairment rating may deviate from the *Guides* if the exception is "specifically provided for in the guides". *In other words, to deviate from the Guides such deviation must be allowed by the Guides itself.*[3]

We must initially determine which edition of the *Guides* applies. The examining physician must use the "latest" edition of the *Guides.* 85 O.S.Supp.1987, § 3(11).[4] The first printing of the third edition of the *Guides* was in November of 1988. The claimant's examinations by the employer's doctor occurred in November of 1987 and February of 1988. Clearly, the second edi-

---

1. We apply the statute in effect at the time of the injury. *Knott v. Halliburton,* 752 P.2d 812, 813 (Okla.1988); *Lee Way Motor Freight v. Wilson,* 609 P.2d 777, 779 (Okla.1980).

2. This evaluation of impairment must be according to the *Guides* even when the conclusion is that the claimant has *not* sustained impairment to the respiratory system. *Gaines v. Sun Refinery and Marketing,* 790 P.2d 1073, 1076–1077 (Okla.1990). Language to the contrary in *Case v. Mack Trucks,* 773 P.2d 765, 766 (Okla. App.1989) is hereby disapproved.

3. This has not always been true. 85 O.S.Supp. 1978, § 3(11) allowed for assessments deviating from the *Guides* when the deviation was explained by the examining physician. In 1985 § 3 was amended and no longer provides for deviation based on mere explanation. 85 O.S. Supp.1985, § 3(11).

4. We note that injuries occurring on or after November 1, 1984, through December 31, 1988, are evaluated by the Second Edition of the AMA Guides under the new Rules of the Workers' Compensation Court, Rule 21(D), 85 O.S.Supp. 1990 Ch. 4, App. (Effective November 1, 1990).

tion was the appropriate standard by which to determine York's impairment.

A review of the findings made by the employer's doctor is needed in discussing the doctor's deviation from the *Guides*. The employer's doctor, Dr. F., referred York to a hospital where he received spirometry tests in October of 1987. The tests indicated a severe obstructive and restrictive lung disease. In the first examination York's forced vital capacity (FVC) was 44% of the predicted value, and this indicates a severe impairment.[5] Dr. F. reported, however, that York appeared, walked, and acted "vigorously" and was of the opinion that York had no lung disease. He said, "In this respect, of course, I am taking exception to the AMA Guides, as I feel the Guides do not take into consideration hyperventilation syndromes and anxiety as causing false results on the pulmonary testing procedures. This man's hyperventilation syndrome is not related to any job circumstance."

Dr. F. requested further spirometry tests and an analysis of arterial blood gases. The spirometry tests were repeated in February of 1988. On the same day York's FVC was first 42% and then 82% of the predicted normal value, and his FEV1 was first 53% and then 83% of the predicted normal value. York's highest values for FVC and FEV1, 3.37 and 2.87 respectively, show a mild impairment i.e., a Class 2 impairment.[6] Dr. F. reported:

"Finally, I will repeat my original statement as of my report of November 11, 1987 that this man has no lung disease and he has had *no* lung disease. His only problem is hyperventilation syndrome.

In other words, when the pulmonary studies are not reliable and not performed properly with *inconsistent re-*

*sults,* it is my opinion that these results cannot be used at all and one must evaluate these people on the basis of their clinical status and objective findings which cannot be changed.

Again, due to the above reasons *I again will take exception to the AMA Guides and rate this man as having zero impairment due to his lungs.*

This man is perfectly healthy and can continue doing his usual type of work without restrictions."

This report indicates that the spirometry test results cannot be used to determine impairment because they are inconsistent with each other. We first address the inconsistent results and then the rating of no impairment.

### 1. Inconsistent test results.

■ The second edition to the *Guides* states:

"The spirometric tests should be performed as described in the 1978 ATS Epidemiology Standardization Project. The equipment, methods of calibration, and techniques should meet the ATS criteria." *Guides* at 88.

The *Guides* refer to an article: "Crapo RO, Morris AH: Reference Spirometric values using techniques and equipment that meet ATS recommendations. *Am Rev Respir Dis* 1981; 123:659–664." *Guides* at 101. This article cites the standards published by the American Thoracic Society at: Gardner RM, et al. Snowbird workshop on standardization of spirometry: a statement by the American Thoracic Society published in the *American Review of Respiratory Disease*, 1979, 119:831–838. In these referenced materials the American Thoracic Society standards describe "acceptable" spirometry results as follows:

---

**5.** Table 1–"Classes of Respiratory Impairment" *Guides* at 86.

**6.** The face of Dr. F.'s report shows a Class 2 impairment if the spirometry results are used. We explained the method for calculating per cent of predicted values in *Whitener v. South Central Solid Waste Authority*, 773 P.2d 1248, 1251–1252 (Okla.1989). From Dr. F.'s report:

FVC predicted of 5.20–1.115 (confidence interval) = 4.09 (lower limit of normal). York's best effort for FVC was 3.37 and Dr. F. reported this amount as 82% of the predicted value. York's FVC was below the lower limit for normal as defined by the 95% confidence interval but above the 60% of predicted. Thus, the face of Dr. F.'s report shows a Class 2 impairment for York as explained in Table 1 of the *Guides*.

"A minimum of 3 acceptable FVC maneuvers will be performed. *Acceptability will be determined by the technician's observation that the subject* understood the instructions and performed the test with a smooth continous exhalation, with apparent maximal effort, with a good start, and *without* (1) coughing, (2) Valsalva maneuver (glottis closure). (3) Early termination of expiration ... (4) A leak. (5) An obstructed mouthpiece ... (6) An unsatisfactory start of expiration, characterized by excessive hesitation or false starts ... (7) *An excessive variability among the three acceptable curves. The best of the 3 acceptable curves should not vary by more than ±5 per cent of reading or ±100ml, whichever is greater.*" *Am Rev Respir Dis* 1979; 119 at 836. (Emphasis added).

The seventh factor set forth above indicates that spirometry maneuvers which are otherwise acceptable will not be acceptable for rating impairment if the best maneuver varies more than the stated amount.

York's two best efforts for FVC were 3.37 liters and 2.19 liters. These two efforts vary by more than 5%, and Dr. F. treated the spirometry results as unacceptable for measuring impairment because of this variation.[7] Thus, Dr. F.'s report did not deviate from the second edition of the *Guides* merely because he disregarded inconsistent spirometry results.

### 2. Evaluation of no impairment.

■ We now come to the next issue: does Dr. F.'s report deviate from the *Guides* in assessing York as in Class 1, i.e., with no impairment. Dr. F. utilized the spirometry tests required by the Guides to evaluate lung mechanics in his examination. They are (1) the FVC (for forced vital capacity), a volume measurement, (2) the FEV1, the volume of air moved in the first second of a forced expiration, a flow rate measurement, and (3) the ratio of the one to the other. He did not employ the estimated exercise capacity test, a test done on a treadmill or cycle ergometer to estimate oxygen consumption per minute, i.e., the VO2. In disregarding the spirometry tests Dr. F. wrote

"This inconsistent result and obvious improvement on the same day, that is, before and after arterial blood gases were drawn from his arm show that this man's results are certainly not reliable. They should be discarded entirely as this man was either not cooperating with this test or intentionally attempted to change the results to imitate lung disease."

(This referred to Claimant's FVC jumping from 42% to 82%, and his FEV1 from 53% to 83%, in the same day.)

The Guides set out the next step for a testing physician who doubts the cooperation of the claimant in the testing process—and it is the VO2. They state:

"**Estimated exercise capacity**: [VO2] *Testing to measure exercise capacity should be done* (1) *when* an individual's spirometry and Dco measurement are not within the 95% confidence interval for his or her age and height, OR (2) his or her spirometry and Dco measurements do not indicate severe impairment as defined below; OR (3) the individual states that he or she is physically unable to meet the demands of a specific job because of breathlessness; OR (4) *the individual has not performed maximally or correctly in the spirometry or Dco tests.*" *Guides* at 97.

Clearly, under Dr. F.'s conclusions, category number four applies here: "the individual has not performed maximally or correctly in the spirometry or Dco tests". Thus, Dr. F. was required to perform an estimated VO2 determination, and his failure to do so shows an unauthorized departure from the *Guides*.[8]

---

7. Although such action was authorized by the 1978 standards, the third edition of the *Guides* treats such variability as requiring more spirometry testing rather with complete disregard. American Thoracic Society Committee on Proficiency Standards for Pulmonary Function Laboratories; Standardization of spirometry—1987 update. *Am Rev Respir Dis* 1987; 136:1285–1298, at 1291. (Cited in the third edition of the *Guides* at 118).

8. Another test sometimes used in pulmonary impairment assessment is the single breath Dco

York objected to the admission of Dr. F.'s report for non-compliance with the *Guides*. In reviewing this objection we note that the case was tried prior to the mandate in *Gaines v. Sun Refinery and Marketing*, 790 P.2d 1073 (Okla.1990), and thus the objection need not have had the specificity now required under that case. We find that Dr. F.'s report failed to comply with the *Guides*, and was thus insufficient to sustain the trial court's order.

## II. The claimant's evidence.

The deposition of York's doctor was submitted at trial. The trial court found that York did not sustain an accidental injury arising out of and in the course of his employment with the respondent. The trial court further found that York's medical evidence was not competent, and that he had failed to meet his burden of proof as set forth at Section 3.4 of Title 85.

Generally, "[t]he burden of proof in workers compensation cases rests upon the claimant seeking benefits to establish all the essential elements of his claim". *Armco, Inc. v. Holcomb*, 694 P.2d 937, 939 (Okla.1985). Our review of the claimant's evidence shows that he met that burden.

The employer stipulated that York was an employee at the time of the alleged injury and York testified as to his employment conditions. York testified that during his employment he was exposed to carbon dust and asbestos and explained the manner in which he was exposed. York testified that he had never smoked cigarettes but was exposed to the cigarette smoke of other employees. York also testified that he was exposed to fumes from a solvent mixed with kerosene. He stated that the fumes irritated his throat and nose

and that he started noticing "mucous build-up in my throat". He sought medical attention from the company doctor and that doctor was of the opinion that the mucous was from an ulcer. York testified that there was a ventilation fan: "... but it never worked. We asked the supervisor to fix it. We never could get it fixed."

York's doctor, Dr. C., said that York had partial permanent impairment of 25 percent impairment to the body as a whole secondary to Class 2 respiratory impairment and damage to his lungs and 10 percent partial permanent impairment secondary to obstruction in the upper airway respiratory system. Dr. C.'s opinion concerning York's exposure to certain substances at Burgess Norton was summarized: "It's my medical opinion that these [substances] have caused some marked respiratory impairment to this gentleman".

The doctor testified that York listed the substances he was exposed to at his employment and the amount of time he spent in the various positions of employment. Dr. C. explained the particular medical problems associated with exposure to kerosene and its fumes and that such problems were experienced by York. Dr. C. also explained that exposure to natural gas was consistent with the pulmonary edema experienced by York. Dr. C. testified that he did not find any evidence of pulmonary problems as would occur from exposure to particulate matter such as dust, carbide, or asbestos. He explained that his opinion was based upon York's description of the substances he was exposed to at employment, his medical knowledge of the consequences to exposure to those substances York listed, and York's manifestation of symptoms consistent with exposure to

to determine diffusing capacity of carbon monoxide. A Dco test "should be performed when a patient has respiratory complaints that are of greater severity than the observed spirometry results would indicate." *Guides* at 97. We explained in *Orrell v. B.F. Goodrich*, 787 P.2d 848 (Okla.1990), that medical discretion is used in determining whether particular subjective complaints correlate with the spirometry results, and thus, this court would not second guess a medical decision which finds the Dco test to be unnecessary. Our analysis herein is consistent

with *Orrell*. In the case before us the physician exercised his judgment and made a finding that the claimant was not performing the tests maximally or correctly. The *Guides* require further testing when such a finding is made. The analogous situation with the Dco test would occur when a physician makes a finding that a patient does indeed have respiratory complaints that are of a greater severity than the observed spirometry would indicate—and then after making such a finding fail to give the Dco test.

those substances while working for his employer. We find this opinion to be in compliance with the *Guides* and consistent with our reasoning in *Gaines v. Sun Refinery and Marketing,* 790 P.2d 1073 (Okla.1990).

In *Gaines* we explained that a report on impairment due to exposure to toxic substances should be based upon information "regarding the period or extent of exposure ... [and an] estimate [of] the hazard posed by the toxic chemicals and fumes." *Id.* 790 P.2d at 1078. Dr. C. explained that he had an estimate of the hazard posed by the substances York was exposed to at employment. Dr. C. also explained that York had informed him of the duration of his exposure to the substances.

Dr. C. testified that he did not need to know the exact amount of exposure in making his conclusions regarding the substances involved because "we know as physicians that the individuals have different responses to certain levels and length of exposure." Dr. C. essentially testified that the extent of York's exposure was of sufficient duration and had the temporal relationship to a type of impairment known to be caused by such exposure. The *Guides* provide that an assessment of impairment due to exposure to noxious gases, fumes, or particulate matter is based upon: 1. The year a claimant was first exposed to an agent [gas, fume or particulate matter]; 2. The extent of exposure 3. The total number of years of exposure 4. The claimant's estimate of the hazard the agent posed and 5. The number of years since the exposure ceased. *Guides* at 86. We find that Dr. C.'s opinion was based upon these considerations and complies with the *Guides.*

We have said that the cause and extent of disability must be proved by the testimony of skilled professional people. *Chromalloy–American, Okla. Div. v. Wright,* 567 P.2d 71 (Okla.1977) *Groendyke Transport, Inc. v. Willson,* 527 P.2d 1364 (Okla. 1974) and *Independent School Dist. No. 1 of Tulsa County v. Albus,* 572 P.2d 554

(Okla.1977). Dr. C's deposition discloses the presence and extent of permanent impairment resulting from accidental injury sufficient to meet York's burden of proof.

### III. Conclusion.

York's evidence was sufficient to make a prima facie showing of an accidental injury arising out of and in the course of employment. The claimant met his burden of proof. By failing to administer the VO2 test the employer's medical witness impermissibly deviated from the *Guides,* and his report was thus insufficient to support an order denying benefits. The opinion of the Court of Appeals is vacated. The order of the trial judge is reversed, and pursuant to our announcement in *Gaines, supra* at 1081, the case is remanded to the Workers' Compensation Court for a new trial.

HARGRAVE, C.J., OPALA, V.C.J., and HODGES, LAVENDER and ALMA WILSON, JJ., concur.

KAUGER, J., concur specially.

SIMMS, DOOLIN, JJ., dissent.

OPALA, Vice Chief Justice, concurring.

I concur in the court's disposition of the claim and in its pronouncement. I write separately to explain why I join today's opinion.

This claim is for respiratory impairment. According to the employer's physician, the claimant's ventilatory function (spirometric) test results [1] are inconsistent and hence "unacceptable." The medical expert explained that, in his opinion, the claimant either failed to cooperate or tried to imitate symptoms of lung disease. The American Medical Association's "Guides to the Evaluation of Permanent Impairment" [Guides] [2] requires that a doctor confronted with an uncooperative patient test that person's

---

1. For an explanation of the method by which "normal" ventilatory function values are to be compared with actual test results, see *Whitener v. South Cent. Solid Waste Auth.,* Okl., 773 P.2d 1248, 1251–1252 (1989).

2. The Guides' second (1984) edition applies to this claim.

"estimated exercise capacity." [3] The physician's failure to administer this test and to include its results makes the evaluation *substandard* under the Guides and hence saps the medical report of *probative value*.[4] Because this flaw in the employer's medical proof appears curable, the claim is properly remanded to afford the employer an opportunity to replace the substandard report with one that is defect-free.

Today the court correctly follows the teaching of *Gaines v. Sun Refinery and Marketing*[5] by directing the trial tribunal to *reconsider the entire claim upon remand.*[6]

## KAUGER, Justice, concurring specially:

I note that certiorari was granted on November 21, 1989. In *Gaines v. Sun Refinery & Mktg.*, 790 P.2d 1073, 1081 (Okla.1990), which was mandated on May 4, 1990, we held that:

> "Henceforth, and until such time as cases shall come before us tried after mandate herein, when a medical report which is the sole basis for an award or denial of award is held to be incompetent or non-probative as evidence under Rule 20 of the Rules of the Workers' Compensation Court, this Court will reverse the judgment on which it is based and remand for further proceedings, ..."

**3.** The Guides, at p. 97, provide as follows: "Testing to measure exercise capacity should be done: * * * (4) [when] the individual *has not performed maximally or correctly* in the spirometry of Dco tests." (Emphasis added.)

**4.** The *probative value* of a medical report, unlike its competence or admissibility, denotes the proof's legal efficacy to provide evidentiary support for that which it seeks to establish. Thus, if the report in evidence meets the Guides' standards for evaluating compensable impairment, it has probative value for that purpose. It can hence be described as "probative of compensable impairment." In short, evidence which is sufficient in law as proof of a fact is said to be "probative" of that fact. See *Whitener v. South Cent. Solid Waste Auth.*, *supra* note 1, 773 P.2d at 1249 n. 1; *Akin v. Estate of Hill*, 201 Kan. 306, 440 P.2d 585, 590 (1968). The *extent to which weight is to be accorded* admitted probative evidence is an issue for the trier of fact. When it is urged that offered *or* admitted proof is *completely devoid of any* probative force, the challenge calls for testing the evidence as *effective* legal proof for the facts it is tendered to establish. This presents a pure question of law. *Pea-*

I concur here because this cause preceded *Gaines.* The Workers' Compensation Court heard this matter on March 24, 1988. I write to re-emphasize that when cases reach us which have been tried after May 5, 1990, employers and employees alike must present competent evidence of injury at the time of trial—there will be no more "overs". This rule is necessary to preserve judicial economy, and to assure that there will be a meaningful end to litigation.

## SIMMS, Justice, dissenting;

I must respectfully Dissent. I submit the majority opinion is predicated upon an erroneous premise, that is, AMA Guidelines must be applied and the tests required thereby given by the examining physician even though that physician finds the patient has no lung disease and "0" impairment.

As I read 85 O.S.Supp.1986, § 3(11), the purpose of the Guide is to *evaluate impairment,* not to determine if in fact an impairment exists. Rule 20(3)(i) requires the statement of substantial compliance with the Guides to be in reference to detailed factors upon which an *evaluation of permanent impairment* is based. The medical report in question concludes there

*body Galion Corp. v. Workman*, Okl., 643 P.2d 312, 315 n. 7 (1982).

**5.** Okl., 790 P.2d 1073, 1080–1081 (1990). Before *Gaines,* whenever an appellate court held an employer's or claimant's medical evidence to be fatally flawed, the trial tribunal was directed to enter an order based upon the opponent's competent evidence. This technique was known as the *Perlinger* "jackpot rule." See *LaBarge v. Zebco*, Okl., 769 P.2d 125, 130–131 (1989) (Opala, J., concurring in part and dissenting in part). Its demise came with the teaching of *Gaines.* See also, *Gaines v. Sun Refinery and Marketing, supra* at 1082 (Opala, V.C.J., dissenting).

**6.** Contrary to the trial judge's findings, the claimant's evidence *does* establish the basic elements of his claim: (a) he was exposed to harmful airborne particles at work for a period sufficient to cause permanent injury, (b) his respiratory system is impaired and (c) the impairment is causally attributable to the workplace-related exposure.

is *no* permanent impairment. This conclusion was based upon the doctor's objective findings which, he observed, cannot be changed.

I would hold the medical report to be competent and admissible, however, I would leave to the trier of the facts the determination of what weight, if any, should be given the report.

Simply put, it is my position that a physician need not resort to the Guides to evaluate impairment where there is no finding of impairment.

I am authorized to state that Justice DOOLIN joins in the views expressed herein.