**FARM FRESH, INC., Petitioner,**

v.

**Charles BUCEK and the Workers' Compensation Court, Respondent.**

No. 82854.

Supreme Court of Oklahoma.

May 9, 1995.

Charles S. Plumb, Benjamin J. Chapman, Doerner, Stuart, Saunders, Daniel, Anderson & Biolchini, Tulsa, for petitioner.

Art G. Mata, Mata & Mata, Lawton, for respondent.

OPALA, Justice.

The dispositive issues presented on certiorari are: [1] Does the 85 O.S.1991 § 17(D)[1] requirement—that a trial tribunal's deviation of more than 10% from the *impairment rating* by an independent court-appointed physician be specifically identified—apply to evaluation of *permanent total disability?* and if not [2] Is the trial tribunal's award of permanent total disability supported by competent evidence? We answer the first question in the negative and the second in the affirmative.

## I

### THE ANATOMY OF LITIGATION

The claimant, Charles Bucek [claimant or Bucek], was employed as a maintenance engineer for Farm Fresh Bakery [employer]. While repairing a bun oven on October 1,

---

**1.** For the pertinent terms of 85 O.S.1991 § 17(D), see *infra* note 5.

1989, he slipped on an oil-slick floor, sustaining injuries to his neck, back and left shoulder. The trial tribunal ordered the claimant's examination by an independent medical expert [Dr. H. or IME].

At the August 24, 1993 hearing several medical reports and records were admitted. The claimant's rating physician, Dr. E., concluded that Bucek had sustained 85% *permanent partial impairment* to the whole person and as a result was *permanently totally disabled.* The employer's rating physician, Dr. C., stated that the claimant had sustained 16% permanent partial impairment to the body. Dr. H., the court-appointed physician, who had been the claimant's treating physician, opined that Bucek had sustained 11% permanent partial impairment to the whole person. According to Dr. H., the claimant could return to work.

The trial tribunal entered an award for permanent total disability,[2] which *gave no explanation for its 89% in impairment deviation from the rating in the IME report.* On appeal to a three-judge review panel, the employer argued that, in light of the IME's 11% permanent partial impairment assessment, the trial tribunal's determination of the claimant's permanent total disability had no support in the record or in compensation law. By its December 21, 1993 decision the review panel adopted the trial tribunal's award of permanent total disability. This proceeding for corrective relief, brought by the employer, followed.

The Court of Appeals sustained the panel's decision, holding that (a) the question whether claimant is permanently totally disabled is one of fact to be reviewed by the familiar standard of competent medical proof, and (b) the § 17(D)[3] requirement—that a trial tribunal's deviation of more than 10% from the IME impairment rating be specifically identified—applies *only* to evaluations of *permanent impairment* and not to a *permanent total disability rating.*[4]

Although we reach the same result as the Court of Appeals, we vacate that court's opinion to provide a more extensive guidance for the distinction between *impairment* and *disability* in the post–1977 benefits regime.

## II

### THE "IMPAIRMENT" AND "DISABILITY" DISTINCTION IN THE 1977 WORKERS' COMPENSATION ACT

The employer urges that the trial judge *impermissibly* deviated more than 10% from IME's *impairment rating* because he failed to provide the explanation required by § 17(D) of the compensation law.[5] This issue calls for an analysis of the conceptual distinction between *disability* and *impairment* embodied in the 1977 Workers' Compensation Act [1977 Act].[6] When examining the impact of this legislation, it is helpful *first* to explore Oklahoma's pre–1977 benefits regime.

### The Pre–1977 Disability–Based Compensation Scheme

When first enacted in 1915, Oklahoma's regime for delivery of benefits to an injured worker was designed to restore lost earnings for compensable harm from "hazardous employment".[7] This institutional design established four categories of disability-based ben-

2. The parties stipulated at the hearing to the rates of $208.01 for temporary total and permanent total disability and $173.00 for permanent partial disability.

3. For the pertinent terms of 85 O.S.1991 § 17(D), see *infra* note 5.

4. The Court of Appeals relied on *Bi–Lo Food Warehouse v. McCause,* Okl.App., 836 P.2d 689 (1992), which holds that § 17(D) applies only to awards of *permanent impairment* and not to *temporary total disability.*

5. The terms of 85 O.S.1991 § 17(D) (the version in effect at the time of the hearing) are:

"D. The impairment rating determined by the third physician may be followed by the Court. If the Court deviates from the third physician's impairment rating by more than ten percent (10%), the Court shall specifically identify the basis for such deviation in its order."

6. 85 *O.S.Supp.1977* §§ 1 et seq.

7. *See Nelson v. Rialto Mining Co.,* 194 Okl. 628, 154 P.2d 87, 89 (1944); *United States Casualty Co. v. Steiger,* 179 Okl. 407, 66 P.2d 55, 57 (1937).

efits (permanent total, temporary total, permanent partial and temporary partial).[8] The key term *"disability"* was not defined by statute. The court eventually came to measure it by a worker's capacity to perform "ordinary manual or mechanical labor".[9] An injury to a specific, scheduled member of the body (a *classified* disability) was measured by the number of weeks in the member schedule,[10] while one to an *"unclassified* part of the body" fell under the "other cases" clause of § 22 [11] and was compensated on the basis of percentage *disability* to the body as a whole.[12]

### The 1977 Act's Disability–Based and Impairment–Related Benefits Regime

The 1977 Act made two significant changes in the compensation law. It extended coverage to nearly all Oklahoma employees (not just to those in "hazardous employment") and introduced a mixed *impairment* -related and *disability* -based benefits regime. The terms *disability* and *impairment* were given distinct meanings.

*Disability* is designed to measure an employee's capacity for work, i.e., the degree to which an injury affects a person's ability to perform any task for which the worker is reasonably suited by training, education and experience.[13] The purpose of disability-related compensation in the 1977 Act is to *replace the incapacitated worker's lost earnings* [14] for injury to the limbs based on the number of weeks assigned as a maximum for each limb. The Act *left intact* this (pre–1977) wage-replacement concept of *disability* but confined its application *solely* to (1) *temporary* (temporary total and temporary partial) and (2) *permanent total* benefits.[15] Permanent total disability is defined as "[i]ncapacity because of accidental injury or occupational disease to earn any wages in any employment for which the employee is or becomes physically suited and reasonably fitted by education, training or experience." [16] In

---

8. For the pre–1977 compensation regime, see 85 O.S.*1971* § 22. [1] *Temporary Total Disability* is the "healing period or that period of time following accidental injury, when an employee is totally incapacitated for work due to illness resulting from injury." *Oklahoma Natural Gas Co. v. Davis*, 181 Okl. 530, 75 P.2d 435, 436 (1938). The benefits payable were a percentage of the state's average weekly wage to be paid during the continuance of the disability but not to exceed a maximum number of weeks. [2] *Temporary Partial Disability* pertains to a healing period during which the employee has some capacity to work. *Orman v. Capitol Steel and Iron Co.*, Okl., 289 P.2d 375, 377 (1955). [3] *Permanent Total Disability* constitutes a lack of ability to perform substantially in gainful employment without injury to health or serious discomfort. *McClure v. Special Indemnity Fund*, Okl., 475 P.2d 811, 812 (1970); *Dierks Lumber & Coal Co. v. Lindley*, 182 Okl. 185, 77 P.2d 44, 46 (1938). [4] *Permanent Partial Disability* is based on a percentage of loss in the capacity of the body as a whole to perform labor. *Mayberry v. Walker's Masonry*, Okl., 542 P.2d 510, 514 (1975); *J.E. Trigg Drilling Co. v. Daniels*, 193 Okl. 644, 145 P.2d 944 (1943). An earlier (1941) amendment eliminated the need to establish loss of earning power in order to receive compensation for permanent partial disability. *Service Pipe Line Company v. Cargill*, Okl., 289 P.2d 961, 962–963 (1955); ' *Folsom Auto Supply v. Bristow*, Okl., 275 P.2d 706, 710 (1954). *See also Amerada Petroleum Corporation v. Lovelace*, 184 Okl. 140, 85 P.2d 407 (1938) (syllabus ¶ 1), where the court held that a claimant is entitled to compensation for permanent partial disability "without regard to the effect thereof upon his earning capacity."

9. *See J.E. Trigg Drilling Co., supra* note 8, 145 P.2d at 946, where the court held that "[d]isabilities within the meaning of the act refer to lack of ability to do ordinary manual or mechanical work and labor...." (Emphasis added.)

10. *See* 85 O.S.*1971* § 22; *Stoldt Builders, Inc. v. Thomas*, Okl., 393 P.2d 875, 877 (1964).

11. *See* 85 O.S.*1971* § 22.

12. *Stoldt, supra* note 10 at 877.

13. *See* 85 O.S.Supp.1988 § 3(12) (quoted in the text at *infra* note 16); *TWA v. McKinley*, Okl., 749 P.2d 108, 110 (1988); *Eslinger v. Cole Grain Co.*, Okl.App., 655 P.2d 164, 165–166 (1982) (overruled in part on other grounds by *TWA, supra* at 109).

14. *Nelson, supra* note 7, 154 P.2d at 89; *Steiger, supra* note 7, 66 P.2d at 57; *see* Sturm, *The Workers' Compensation Act of 1977*, 3 OKL.CITY UNIV L.R. 1, 12–14 (1978).

15. *See* 85 O.S.Supp.1986 § 22.

16. The terms of 85 O.S.Supp.1988 § 3(12) provided:

"(12) *'Permanent total disability'* means incapacity because of accidental injury or occupational disease to earn any wages in any em-

short, a permanently and totally disabled worker within the meaning of the Act is one eligible for wage replacement because of lack of capacity to earn *any* wages.

*Impairment,* on the other hand, is a *medical condition; it* refers to the effect of the injury upon a person's ability to perform basic life functions.[17] The term *permanent impairment* is defined as "any anatomical or functional abnormality or loss after reasonable medical treatment has been achieved, which abnormality or loss the physician considers to be capable of being evaluated at the time the rating is made."[18] *Permanent partial disability* means "permanent disability" and is the "same as permanent impairment."[19] This definition not only signifies a complete departure from the old theory of ordinary manual or mechanical labor, but also introduces a new and more specific concept for evaluating permanent partial disability by placing it on a footing absolutely equal with permanent impairment, i.e. loss of bodily function.

The American Medical Association Guides to the Evaluation of Permanent Impairment [AMA Guides][20] provides helpful insight into the *impairment-disability* dichotomy. An *impairment* is viewed as a "medical matter", whereas *disability* is deemed to "arise out of the interaction between impairment and external demands."[21] As used in the AMA Guides, (a) *impairment* means "an alteration of an individual's health status that is *assessed by medical means,*" and (b) *disability,* "which is *assessed by nonmedical means,* means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements."[22] *With the sole exception of scheduled member losses, total or partial, the AMA Guides must be used for rating permanent impairment.*[23] In short, permanent partial disability, as distinguished from other payout classes, contemplates recompense for lost physical fitness, though the amount paid the worker must be measured by a percent-

ployment for which the employee is or becomes physically suited and reasonably fitted by education, training or experience; loss of both hands, or both feet, or both legs, or both eyes, or any two thereof, shall constitute permanent total disability." (Emphasis added.)
The 1990, 1992, 1993 and 1994 amendments to § 3 have no effect on this review proceeding.

17. *Sturm, supra* note 14 at 13–14.

18. The terms of 85 O.S.Supp.1988 § 3(11) provided:

"(11) *'Permanent impairment'* means any anatomical or functional abnormality or loss after reasonable medical treatment has been achieved, which abnormality or loss the physician considers to be capable of being evaluated at the time the rating is made. Except as otherwise provided herein, any examining physician shall only evaluate impairment in accordance with the latest 'Guides to the Evaluation of Permanent Impairment' adopted and published by the American Medical Association. The examining physician shall not deviate from said guides except as may be specifically provided for in the guides. These officially adopted guides shall be the exclusive basis for testimony and conclusions with regard to permanent impairment with the exception of paragraph 3 of Section 22 of this title, relating to scheduled member loss; and impairment, including pain or loss of strength, may be awarded with respect to those injuries or areas

of the body not specifically covered by said guides." (Emphasis added.)
The 1990, 1992, 1993 and 1994 amendments to § 3 have no effect on this review proceeding.

19. The terms of 85 O.S.Supp.1988 § 3(13) are:

"(13) *'Permanent partial disability'* means permanent disability which is less than total and shall be equal to or the same as permanent impairment." (Emphasis added.)
The 1990, 1992, 1993 and 1994 amendments to § 3 have no effect on this review proceeding.

20. *AMA Guides,* 3d Ed. (1988).

21. *AMA Guides, supra* note 20, Ch. 1, ¶ 1.1.

22. *AMA Guides, supra* note 20, Ch. 1, ¶ 1.1 (emphasis in original). The *AMA Guides* explains that an *impaired* individual is not necessarily *disabled.* Impairment gives rise to disability only when the medical condition limits the individual's capacity to meet demands that pertain to nonmedical fields and activities. On the other hand, if the individual is able to meet a particular set of demands, the individual is not *disabled* with respect to those demands, even though a medical evaluation may reveal impairment. *Id., supra* note 20, Ch. 1, ¶ 1.1.

23. 85 O.S.Supp.1988 § 3(11), *supra* note 18; Rule 23, Workers' Compensation Court Rules, 85 O.S.1991, Ch. 4, App.; *B.F. Goodrich v. Hilton,* Okl., 634 P.2d 1308, 1310 (1981).

age of wages he (or she) would have earned *but for* the covered injury.[24]

The terms of § 17(D)[25] require that a trial tribunal specifically identify the reason for its award's deviation of more than 10% from the *impairment rating* by an independent court-appointed physician. Section 17(D), construed together with §§ 3(11)[26] and (13)[27]— the latter two of which define the terms *permanent impairment* and *permanent partial disability*—indicates that it is intended to deal with medical *permanent partial impairment* ratings.

■ The issue of *permanent total disability* turns on the evaluation of the worker's present capacity "to earn any wages in any employment for which he is presently suited or fitted by education, training or experience."[28] The determination of a claimant's disability-based benefits presents a fact question for the trial tribunal.[29] Its finding in this case declared Bucek to be totally and permanently disabled. Because § 17(D) has no application to *disability*-related benefits, the trial tribunal neither grounded its award in the AMA Guides nor was it statutorily required to explain why that award deviated (by 89%) from the IME's impairment rating.[30]

**III**

**THE TRIAL TRIBUNAL'S PERMANENT TOTAL DISABILITY AWARD IS SUPPORTED BY COMPETENT EVIDENCE**

■ While the *panel's review* of the trial tribunal's findings is governed by *a clear-weight-of-the-evidence test*,[31] this court, when examining that tribunal's factual resolutions, applies the *any-competent-evidence standard*.[32] If supported by competent evidence, the panel's *findings* may not be disturbed on review.[33]

**A.**

The employer's expert evidence, consisting mostly of medical reports and records, was admitted without objection. Its proof included reports from (a) Dr. C., the employer's rating physician, and (b) Dr. H., the court-appointed physician, who also treated the claimant. Dr. H., who gave him an *11% permanent partial impairment* rating (to the whole person,) stated that the claimant could return to work but recommended that he receive some vocational counselling. According to Dr. C.'s report, the claimant had sustained *16% permanent partial impairment.*

The claimant's proof consists of two letter-reports by his medical expert, Dr. E., and of some other medical records. In his reports

It is neither argued in this case, nor do we find, that the award is based on an impermissible intermixture of the two discrete statutory compensation schemes.

24. 85 O.S.Supp.1988 § 22(3).

25. For the pertinent terms of 85 O.S.1991 § 17(D), see *supra* note 5.

26. For the terms of 85 O.S.Supp.1988 § 3(11), see *supra* note 18.

27. For the terms of 85 O.S.Supp.1988 § 3(13), see *supra* note 19.

28. *See* 85 O.S.Supp.1988 § 3(11), *supra* note 18.

29. *Green Country Restaurant v. Carmen*, Okl., 579 P.2d 1281 (1978).

30. The court's analysis in *Crocker v. Crocker*, Okl., 824 P.2d 1117 (1991), is neither relevant nor helpful in this cause. *Crocker* deals solely with the characteristics of various awards in terms of their divisibility as a spousal asset. The teachings of *Roberts v. Matrix Services, Inc.*, Okl., 863 P.2d 1242 (1993), target overcompensation which results from an award that rests on two inconsistent components of the benefits regime.

31. 85 O.S.Supp.1993 § 3.6A; *Parks v. Norman Mun. Hosp.*, Okl., 684 P.2d 548, 549 (1984).

32. *Owings v. Pool Well Service*, Okl., 843 P.2d 380, 382–383 (1992); *Lacy v. Schlumberger Well Service*, Okl., 839 P.2d 157, 160 (1992); *York v. Burgess–Norton Mfg. Co.*, Okl., 803 P.2d 697, 699 (1990); *Parks, supra* note 31 at 549; *Graves v. Safeway Stores, Inc.*, Okl., 653 P.2d 1236, 1238 (1982); *Standish Pipe Line Co. v. Kirkland*, 188 Okl. 248, 107 P.2d 1024, 1025 (1940); *Barnes v. Indian Territory Illuminating Co.*, 170 Okl. 520, 41 P.2d 633, 635 (1935).

33. *Parks, supra* note 31 at 549; *Carpenter v. Douglas Aircraft Company*, Okl., 420 P.2d 911, 912 (syllabus ¶ 2) (1966); *Leffler v. McPherson Brothers Transport*, Okl., 396 P.2d 491, 493 (1964).

(one eight-page and another one-page analyses), Dr. E. opines that the claimant is permanently totally disabled. The longer report gave the claimant an *85% permanent partial impairment* rating and attributed it to the combined injury of his neck, back, spinal cord, and left shoulder. According to Dr. E.'s shorter report, he did not think the claimant "is going to be able to be re-trained." In the next sentence this physician opines that because the claimant is "well motivated," he "may possibly be re-trained." This report was admitted over the employer's challenge to its probative value based on a seeming inconsistency in the quoted language.

■ Our review of the record reveals that the award of permanent total disability rests on competent evidence. The claimant's medical proof fully explains the reasons for Dr. E.'s opinion. His comprehensive (eight-page) report contains (a) a relevant history of the claimant's injuries, complaints and medical treatment, (b) a description of the examination, tests, and medical records reviewed, as well as (c) an evaluation of the extent of his impairment. This report clearly informs that were the claimant returned to work, he could not perform if he were required to stand for more than an hour or to sit for more than 20 minutes. According to Dr. E.'s explanation, the claimant cannot do *repetitive work* with his left arm or *any work* with his left arm above his waist. This is so because the claimant cannot do any work if he has to sit with his neck in one position, such as he would occupy when reading or looking at a monitor. The claimant, who has but a high school education, must have the ability to move and lay down. He had previously worked as a maintenance man. As a result of his injuries (severe pain in his neck and left shoulder, coupled with pain and weakness in his left arm and leg), Dr. E. *finally concludes* in his "bottom line" that it is doubtful Bucek could return to any type of gainful employment for which he is or could become reasonably suited by education, training or experience.

### B.

The employer also argues that the claimant has the ability "to earn any wages in any employment" within the meaning of § 3(12).[34] In support of its position the employer directs us to the claimant's testimony that (a) he has been employed twice since his accidental injury for a period of about six weeks; (b) he is an Army veteran with a GED (general *high school* equivalent diploma) and some microscopic college credits; (c) he is able to drive and was employed as a driver after his injuries; and (d) he has custody of, and cares for, his 4– and 5–year old grandchildren.

■ Although ordinarily the employer has the burden of establishing facts that challenge the claimant's entitlement to benefits under the workers' compensation law, when, as here, the record shows the worker has been continuously employed since the initial injury, the onus shifts to the worker to produce expert evidence that will overcome the contrary proof from the employer.[35] The claimant met the law's requirement.

According to the record, the claimant attempted to work after his injury, but was unable to keep a job because of intense pain that prevented him from meeting his employer's standards. His testimony is supported by competent medical evidence based on Dr. E.'s clinical findings. Bucek has been a manual laborer for some 30 years, working in the oil field as a roughneck and driller. According to him, he has relied upon manual labor for his livelihood because he has neither formal education nor training. He acquired his GED while in the Army, where he also received his only two college credits (the latter some 27 years ago). The claimant explained that while his grandchildren live with him, he is not their primary care giver while they remain in his home. He does not drive them to and from school. The grandchildren are away from the home during the day from

---

**34.** For the pertinent terms of 85 O.S.Supp.1988 § 3(12), see *supra* note 16.

**35.** *Special Indemnity Fund v. Stockton,* Okl., 653 P.2d 194, 198 (1982) (overruled in part on other grounds by *Special Indem. Fund v. Choate,* Okl., 847 P.2d 796, 810 n. 31 (1993)).

9:00 a.m. until his wife picks them up at 5:00 p.m.

We hold that, on this record, there is competent medical evidence to support the trial tribunal's award for permanent total disability.

### CONCLUSION

Oklahoma's current benefits regime gives a *distinct* legal meaning to the terms *impairment* and *disability*. A *disability-related award,* which is designed to replace a worker's lost wages while he (or she) is unable to work, is assessed mainly upon nonmedical means—i.e., the claimant's training, education and experience. An *impairment-based award* must rest solely on the claimant's health condition and is measured entirely by medical standards for measuring the loss of bodily function. The *statutory requirement in § 17(D)*—that any deviation between an award's and a court-appointed physician's impairment rating be specifically explained—*addresses itself solely to impairment-based awards.* Claimant's medical evidence competently supports the award of permanent total disability by overcoming the proof that he may have retained a sufficient residual capacity for work in gainful employment.

ON CERTIORARI PREVIOUSLY GRANTED, THE COURT OF APPEALS' OPINION IS VACATED AND THE REVIEW PANEL'S ORDER IS SUSTAINED.

ALMA WILSON, C.J., KAUGER, V.C.J., and LAVENDER, SIMMS, HARGRAVE, OPALA and WATT, JJ., concur;

HODGES and SUMMERS, JJ., dissent.