**HERRIN et al. v. ARNOLD, Judge.**

No. 28307.   July 26, 1938.

Rehearing Denied Sept. 27, 1938.

J. R. Dickerson, L. V. Reid, and Rayford S. Reid, for plaintiffs.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., for defendant.

Walter Mathews, amicus curiae.

GIBSON, J.   The point at issue here is the validity of those sections of article 2 of chapter 24 of the Session Laws of 1937 which have to do with the fixing of minimum prices barbers may charge for their services. The case is here on application for writ of prohibition to restrain a district judge from making any further orders in an injunction suit brought by the Board of Barber Examiners of the State of Oklahoma against the plaintiffs here.

According to their petition the plaintiffs have for many years conducted their barber shop in the city of Edmond and have, by charging low prices, built up a substantial business; and they have at all times conformed to sanitary regulations.

On September 11, 1937, an organized group of more than 75 per cent. of the duly licensed and practicing barbers in said city entered into an agreement establishing minimum prices. This and the acts of the Barber Board in reference thereto were done under the purported authority of section 12 of said act. The agreement was presented to the board and, so far as this case is now

concerned, was duly considered and an investigation made. Thereupon an order was made fixing minimum prices for barber work in the city of Edmond. When the plaintiffs refused to conform to the order, the injunction suit and this action as a consequence thereto resulted. Sufficient showing has heretofore been made to invoke the jurisdiction of this court. Such further facts as may be pertinent will be stated in the discussion.

The validity of the statute is challenged on the ground that the act, particularly section 12, is in contravention or violation of the following sections of the State Constitution: Section 2 of article 2; section 1 of article 4; section 1 of article 5; section 59 of article 5; section 7 of article 2; and section 51 of article 5. It is further contended that it violates article 5 of the Bill of Rights and the Fourteenth Amendment to the Constitution of the United States

Appellate courts of four states have declared a similar law unconstitutional. Duncan v City of Des Moines, 268 N. W. 547 (Iowa); City of Mobile v. Rouse, 173 So. 254, 173 So. 266 (Ala.); State v. Ives, 167 So. 394 (Fla.); Ex parte Kazas, 70 P.2d 962 (Cal. App ). Of these cases the first three were decided before the decision of the Supreme Court of the United States in the case of West Coast Hotel Company v. Parrish (300 U. 'S. 379, 81 L. Ed. 703, 57 S. Ct. Rep. 578, 108 A. L. R. 1330), which specifically overruled the case of Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, 43 S. Ct. Rep. 394.

The Adkins Case had long stood as a guidepost pointing the way legislation in reference to price fixing for personal services or commodities should go. But with increasing economic complexities, greater demands for governmental supervision, keener competition, and the increasing exercise of the latent power of the Legislature in reference to conditions and hours of labor and safeguards for the public interest, it became evident that old guideposts must be repainted or their direction changed. Hence we find in the New York milk control case of Nebbia v. New York, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. Rep. 505, and others, a tendency to change the direction; and in the West Coast Hotel Case the highest court in the land turned the signpost completely around, adopting in effect the reasoning of the minority in the Adkins Case. Consequently, so far as the federal Constitution is concerned, the question is now: How far in the new direction may we go

before we encounter barriers of the Constitution?

The California case, supra, discusses the West Coast Hotel Case and the others and yet finds the way still barred to legislation such as this. A consideration of that and similar cases is proper and will receive attention at the appropriate places.

Most fundamental of the questions presented is whether the Legislature has the power to fix or provide for the fixing of minimum prices. This question arises largely under section 2 of article 2 of the State Constitution and the due process clauses of the federal Constitution. The State Constitution provides that all persons have the inherent right to liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry. Respecting this provision we said in Nation v. Chism, 154 Okla. 50, 6 P.2d 766:

"The right to labor or earn one's livelihood in any legitimate field of industry or business is a right of property, and any unlawful or unreasonable interference with or abridgment of such right is an invasion thereof, and a restriction of the liberty of the citizen as guaranteed by the Constitution."

The foregoing statement is true, of course, as to any legitimate occupation, and it will be noted that the barrier is against any **unlawful** or **unreasonable** interference or abridgment of the right and not against any interference or abridgment of the right. It will be noted also that in the same case we said further:

"The right to practice the trade of barbering is one of the common occupations of life. The barber has a legal right to practice his trade without hindrance. * * * That that right may be regulated by valid legislation is not disputed."

The Legislature has attempted to regulate the barbering occupation by prescribing certain sanitary regulations for barber shops and personal conduct. Section 4325 and following, O. S. 1931; chapters 60 and 185, S. L. 1933. Laws of such a nature have been generally upheld as within the police power of the state. See Patton v. Bellingham (Wash.) 38 P.2d 364, and annotation thereto in 98 A. L. R. 1088. And the Supreme Court of the United States early declared that the federal Constitution does not prevent the state for the good of its society from passing legislation to promote the health, peace, morals, education, and good order of the people. Barbier v. Connolly, 113 U. S. 27, 28 L. Ed. 923, 5 S. Ct.

Rep. 357. And in Soon Hing v. Crowley, 113 U. S. 703, 28 L. Ed. 1145, 5 S. Ct. Rep. 730, that high court said:

"However broad the right of every one to follow such calling and employ his time as he may judge most conducive to his interests, it must be exercised subject to such general rules as are adopted by society for the common welfare. All sorts of restrictions are imposed upon the actions of men, notwithstanding the liberty which is guaranteed to each."

Since then the right to reasonable regulation has been repeatedly recognized by this and other courts.

The inherent police power of the state has few fixed limitations; rather "its limitations are plastic in their nature and will expand to meet the actual requirements of an advancing civilization and adjust themselves to the necessities of our multiplying complexities in moral, sanitary, economic, and political conditions." Ex parte Tindall, 102 Okla. 192, 229 P. 125. In enacting much of modern legislation, it has often been said, the Legislature is merely making a new application of an already existing power, not exercising a new power.

The Legislature here, after prescribing certain standards to be met, sanitary conditions to be maintained, found, so it has declared, that such unfair trading practices had been carried on in barber shops, and such unfair competition had been indulged in, that it had become impossible for the average barber to support and maintain reasonably safe and healthful barbering services to the public. It further found that such conditions constituted a menace to the health, welfare, and reasonable comfort of the inhabitants of the state and tended to transmission of disease. The ominous portents of such findings as stated in section 1 of the act here under consideration may seem to one not a legislator somewhat extravagant and too lugubrious, but we cannot for such reasons discard the entire purpose of the act or ignore the stated intent of the Legislature. Of course, the mere recital in the act of the conditions which gave rise to the enactment is not controlling on the courts so that they must declare that to be which palpably is not. But the Legislature is primarily the judge of the necessity of the enactment, every possible presumption is in favor of its validity, and though the court may hold views inconsistent with the wisdom of the law, it may not annul the law unless palpably in excess of legislative power. See Nebbia Case, supra.

Legislators must be presumed to be in touch with their own local conditions. They are elected generally upon platforms which have called attention to local conditions, so that when assembled the conditions and needs of particular localities must to some measure at least be deemed to be imparted through the local legislators to the other members of the lawmaking body, thus the conditions of the state in gross become imparted to the whole group, and from the composite picture may be drawn a fair likeness of the economic, social and political status of the state. Legislators are not required to hold special hearings with witnesses to inform them of conditions, or to act through investigating commissions before passing legislation. Nor does their knowledge need to be such as we call "judicial knowledge." The presumption must be that the Legislature has acted upon sufficient information as to needs of the people, and its action cannot be nullified by showing it made no special investigation. See Townsend et al. v. Yeomans, 301 U. S 441, 81 L. Ed. 1211.

The decision of the Supreme Court of the United States in the case of New State Ice Company v. Liebmann, 285 U. S. 262, 76 L. Ed 747, 52 S. Ct. Rep. 371 (appealed from this state), was based upon the theory that the industry there under consideration was not so imbued with a public use as to warrant the regulation there attempted. The question there did not relate to prices. In a strong dissenting opinion Mr. Justice Brandeis declared:

"The notion of a distinct category of business 'affected with a public interest,' employing property 'devoted to a public use,' rests upon historical error. * * * In my opinion, the true principle is that the state's power extends to every regulation of any business reasonably required and appropriate for the public protection."

And this philosophy of the law finds majority expression in the Nebbia Case, where Mr. Justice Roberts, in discussing some of the older cases dealing with property clothed with a public interest, declared that it became so clothed when used in a manner to make it of public consequence, and affect the community at large.

"Thus understood," he asserted, " 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power.' * * *

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth

Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. * * * The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good."

Specifically as to price-fixing laws, the court, in the Nebbia Case, declared:

"But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price. the state is incapable of directly controlling the price itself. This view was negatived many years ago. * * *

"The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

With these statements of the Supreme Court of the United States as a guide, we inquire whether there is a reasonable connection between the price-control features of this law and the public health. Laws relating to the sanitary requirements for barber shops are concededly valid under the police power. But. says the Legislature, in effect, we find that in general there have been such cutting of prices and unfair competition that the average barber cannot meet the health and sanitary demands of the law; we find that if prices can be established so that barber shops can receive not less than a certain amount for their services, they can maintain these standards. so we shall provide for adjusting and raising prices if necessary to the extent and that extent only that may be needed to maintain these health and sanitary requirements. The Legislature has declared that the relationship between prices and sanitary

and health requirements exists. In the general features of the law we find nothing to disprove that such relationship does exist. In the language of Mr. Justice Holmes, speaking to the labor regulation discussed in the opinion in Lochner v. New York, 198 U. S. 45, 49 L. Ed. 937, 25 S. Ct. Rep. 539: "A reasonable man might think it a proper measure on the score of health."

As we construe the act the basis of the minimum prices established is their reasonable relation to, and their sufficiency to properly provide healthful services to the public and keep the shops sanitary. That is the yardstick by which the prices are to be fixed, and, so far as the question now under discussion is concerned, it must be presumed that the Barber Board fixes no prices except upon the basis of the reasonableness and sufficiency to measure up to the legislative standard.

In the California case of Ex parte Kazas, supra, the court says that the Legislature enacted its legislation depending upon certain assumed facts beyond that to which a court could go by exercising its "judicial knowledge." We have said that this ground is erroneous. In this statement we find support.

"The cases that treat of 'judicial notice' have no application whatever to the activities of the Legislature. * * * Legislative notice is broader than judicial notice. The legislative department is equipped to deal with any condition, general or special, however manifested or brought to the knowledge of the law-making power." People v. Goldberger, 163 N. Y. S. 663.

See Townsend v. Yeomans, supra.

Furthermore, the ordinance under consideration in the Kazas Case, so the court declared, did not pretend to concern itself with the health, safety, or morals of the people. The case, too, although referring to the West Coast Hotel Company Case, did not discuss it, but stated that the Florida, Iowa, and Alabama cases rested on other grounds than the Adkins Case and followed them. To these we now refer.

The Iowa court in Duncan v. City of Des Moines, supra, it seems to us (contrary to the statement of the California court), based its opinion largely on the Adkins Case, and upon cases allied to it. Similarly, the Alabama case of City of Mobile v. Rouse, supra, specifically declares that the question presented to it "has been set at rest" by the Adkins Case and similar decisions of the Supreme Court of the United

States. From the Flordia case of State v. Ives, supra, it appears that the price fixing was to be based upon the wages sufficient to maintain the family of the average barber. Upon this phase of the constitutionality of the law, also, it can be said that the court was equally divided. Mr. Justice Brown, who concurred in the result, did not think the act unconstitutional on the ground now being considered. Rather, he said:

"The mere fact that the statute now under consideration deals with a comparatively small business or occupation, * * * does not negative the fact that it is a business which has a very real relation to the public health * * * I am inclined to think that both that statute and the one now under review were and are in their general features within the power of the Legislature to adopt."

The majority opinion in that case, if it can be called a majority, relies upon the Adkins Case and allied cases and adopts the language of a dissenting judge in the Nebbia Case.

In view of these considerations and the fact that the West Coast Hotel Company Case has intervened since these decisions, we do not think those cases can be taken as authoritative here. The opinions of the dissenting judges in these cases are more in keeping with the present decisions of the United States Supreme Court.

To paraphrase the language of Mr. Chief Justice Hughes in the West Coast Hotel Company Case: "And if the securing of sanitary barber shops is a legitimate end of the exercise of state power, how can it be said that the requirement of the payment of a minimum price fairly fixed in order to meet those conditions is not an admissible means to that end?"

The question of the difference, if any, between men and women as to minimum wage legislation does not arise in this case.

It follows that it cannot be said that the act transcends those provisions of either the state or federal Constitution which deal with liberty, due process, or freedom of contract.

We pass then to a consideration of the other constitutional questions invoked, which we may say, arise in reference to the machinery by which the act is to be put into effect.

It is contended that section 12 unlawfully delegates legislative power to an unnamed board and is within the vice of the N. R. A. cases. Schechter Poultry Corporation v. United States, 295 U. S. 495, 79 L. Ed. 1570, 55 S. Ct. Rep. 837; Panama Refining Company v. Ryan, 293 U. S. 388, 79 L. Ed.

Section 12 provides:

"(a) The Board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least seventy-five percentum (75%) of the duly licensed, registered and practicing barbers of any city or town of one thousand (1000) population or more according to the last Federal Decennial Census, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful service and appliances, so as to minimize the danger to the public health incident to such work.

"The Board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety.

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the particular city or town affected by this act in maintaining a barber shop in a clean, healthful and sanitary condition.

"(b) The Board, after making such investigation, shall fix, by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the Board, after investigation made either upon its own initiative or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have authority to vary or refix the minimum prices for a barber's work in each city or town affected by this act."

It must be conceded that, if the section does confer such power on an unnamed, unofficial group, it is within the inhibition of the Constitution. It is also apparent that the act would be invalid if the agreement referred to were approved without investigation, or even if the agreement were considered as the sole evidence of the facts which the board is authorized to find, since no agreements of individuals could make facts exist which do not exist, so far as others and the public are concerned. Those agreeing could bind neither those not agreeing nor the patrons of the shops. It does not appear from the pleadings here what

investigation, if any, was made, nor do we attempt here to determine the fact as to whether the prices fixed by the board are such as "will best protect the public health and safety."

The board does not have arbitrary power; the courts can still inquire into the question of whether its decisions are unreasonable, extravagant, or arbitrary. If here the board has, without more, merely approved an agreement, it has not acted according to law. We do not, however, so understand the pleadings. Presumably it has taken into consideration all conditions affecting the barber profession in its relation to the public health and safety, and has taken into consideration the necessary costs in the particular city or town affected in maintaining a barber shop in a clean, healthful, and sanitary condition, and has, after such investigation, made its official order fixing the minimum price for all work usually performed in a barber shop. It is this order which fixes the scale and it is immaterial whether a price agreement has or has not been made.

It will be noted that the law does not provide that the approval of a price agreement is equivalent to an order of the board. In view of the whole statute it must be construed to mean that the board may, if proof and investigation are sufficient, designate the prices in the agreement or any of them as the minimum prices, but its finding must be based upon all the facts and not upon the mere agreement. The Legislature evidently intended this to be so in order to avoid a possible unconstitutionality. Nor do we find anything in the law to justify the claim that an agreement is a condition precedent. The board may act with or without the submission of an agreement Furthermore there is nothing in the title to the act nor in the act itself which limits its operation to cities or towns of more than 1,000 population. The filing of agreements by barbers in such towns or cities may be a convenient method to invoke the board's power and the Legislature may have thought such consensus of opinion a just basis upon which to commence investigation, but it could not be exclusive.

As we understand the N. R. A. cases referred to above. the vice in the National Recovery Acts was not that certain power possessed by the Legislature was delegated, but that it was delegated without sufficient restrictions as to its exercise. The essential legislative function cannot be delegated, but those cases clearly hold that the legislative body may leave to selected instrumentalities the making of subordinate rules within prescribed limits and determination of facts to which the policy as declared by the Legislature is to apply. Where the Legislature has defined the subjects, the administrative duty of finding facts and making rules accordingly may be delegated. United States v. Grimaud. 220 U. S. 506, 55 L. Ed. 563, 31 S. Ct. Rep. 480. Such was the method used in the New York milk cases and the Washington wage case.

The argument that the law is special and local is based largely on the assumption that it applies only to those cities where agreements are formulated. What we have heretofore said disposes of that assumption. The law was passed for the whole state and there is nothing in it to prohibit its application uniformly if not universally. See Peters v. State, 56 Okla. Cr. 95, 34 P.2d 286; Anderson v. Ritterbusch, 22 Okla. 761, 98 P. 1002; Grable v. Childers, Auditor, 176 Okla. 360, 56 P 2d 357. If in its application discriminatory tactics result, a different question may be presented. On its face it is not necessarily within the prohibition of section 59, art. 5, of our Constitution.

We deem the other questions presented sufficiently answered by the somewhat extended discussion hereinabove made, since they present but different phases of the same theory of unconstitutionality.

To hold that the Legislature may provide for price fixing in the barber industry where the prices must be found to have a direct connection with the health and sanitary regulations imposed is not to hold that regulation of the barber industry is unlimited. The fixing of hours of labor and of prices to be charged or wages may have a direct relation to the health requirements; whereas hours of operation may have no such direct connection. Compare Patton v. Bellingham (Wash.) 38 P.2d 364, condemning statutes restricting hours of business, with the West Coast Hotel Company Case, supra, from the same state.

The question presented is the same in each case. Does the regulation in question have a reasonable and rational relationship to the particular phase of the police power involved? Different facts make different conclusions The legislative finding is not all conclusive and will not be upheld where found to be conjectural, arbitrary, or unreasonable.

Since the submission of this case our attention has been called to the fact that

398

the Louisiana Supreme Court, reversing itself, has considered some of the constitutional questions presented here and has arrived at a conclusion conforming to that herein reached. See Board of Barber Examiners v. Parker (La.) 182 So. 485.

In view of what has been said, the writ must be denied, but any questions of fact that may be presented on the hearing for injunction shall not be considered as being here prejudged.

Writ denied.

OSBORN, C. J., and RILEY, PHELPS, and HURST, JJ., concur. BAYLESS, V. C J., and WELCH and CORN, JJ., dissent. DAVISON, J., absent.

CORN, J. (dissenting). The act of the Legislature fixing a minimum price, or authorizing the same through officers or boards to be charged by barbers, on the theory that it is necessary in order to conduct said business in a clean, healthful, and sanitary manner, in my judgment is unconstitutional.

I therefore dissent.