Ronnie B. DAVIS, Petitioner,

v.

B.F. GOODRICH, own risk, and the Workers' Compensation Court, Respondents.

No. 72080.

Supreme Court of Oklahoma.

Feb. 4, 1992.

As Corrected Feb. 12, 1992.

Richard A. Bell, Norman, for petitioner.

W. Neil Wilson, Wallace, Owens, Landers, Gee, Morrow, Wilson, Watson & James, Miami, for respondent, B.F. Goodrich Co.

HODGES, Vice Chief Justice.

The issue on appeal is whether there is any competent evidence to support the Workers' Compensation Court's finding that the claimant did not sustain or suffer an accidental injury arising out of and in the course of his employment. We find that the Workers' Compensation Court's order is supported by competent evidence.

Ronnie Davis (claimant) filed a workers' compensation claim alleging injury to his lungs and upper respiratory system caused by continuous exposure to hazardous chemicals, including industrial talc, and fumes, while employed by B.F. Goodrich (employer). Claimant began working for the employer on March 15, 1971 and worked there for fifteen years.

The claimant testified to the following. In 1979, he smoked "a pack of cigarettes a day and had been smoking for about 15 years at that rate." There was no limit to the distance he could walk. He had not missed any work because of breathing problems. He was not taking any medication, either prescription or over-the-counter, for breathing problems. Further, he had never seen a doctor for breathing problems. He stated that he had a productive cough but it was "very minimal."

At the trial, both the claimant and the employer submitted written medical reports. Objections to the competency and probative value were made to each report. The judge did not take the objection under advisement but stated that she would consider the arguments to the claimant's medical report. She ruled on the objections by admitting both reports without reservation and did not withdraw the admission. Neither party has addressed the trial tribunal's ruling on the claimant's report or the competency or probative value of that report in this appeal. Because that issue was not appealed, the trial judge's ruling is final and is not an issue before this Court.

The claimant's medical expert, Dr. Miller, rated the claimant as having 20% impairment to his lungs and 10% impairment to his upper respiratory system, resulting in 30% impairment to the body. The employer's medical expert, Dr. Mahaffey, rated the claimant's impairment at zero.

Dr. Miller reported that claimant had smoked about 20 cigarettes a day for 20 years. He testified that cigarette smoking could cause a cough and shortness of breath. Dr. Miller testified that in restrictive lung disease the forced vital capacity (FVC) should be decreased and that in obstructive lung disease, the forced expiratory volume in the first second ($FEV_1$) should be decreased. He testified that the claimant's FVC test was "very close to normal" but that the $FEV_1$ fell into class two (mild impairment), indicating obstructive lung disease. Dr. Miller stated that "[c]igarette smoking most generally causes obstructive" lung disease and that exposure to talc would probably cause both restrictive and obstructive lung disease.

Dr. Miller did not examine any of the claimant's prior medical records. His report did not indicate any cough and sputum production or any wheezing as required by the A.M.A. Guide to the Evaluation of Permanent Impairment (1984 Guide)[1] if the symptoms are present. Therefore, it must be assumed that claimant did not complain of these symptoms. Even though Dr. Miller's report did not indicate any upper respiratory system problems, he gave the claimant a 10% impairment rating to that part of his body.

The employer's medical expert, Dr. Mahaffey, rated claimant's impairment at zero. Dr. Mahaffey noted the claimant's smoking habit. He observed that at no time during the test did the claimant wheeze or appear short of breath. Dr. Mahaffey administered the spirometry tests. The results of those tests were within the normal range. Dr. Mahaffey's report compared the claimant's pulmonary functions from October 1979 through August 1985 with the claimant's current pulmonary functions and found no substantial change.

At trial the respondent submitted a medical evaluation which did not include a $VO_2$ or a $D_{co}$ test. The claimant objected to the report's probative value and to its competence.

The trial tribunal found that the claimant had not suffered an accidental injury arising out of and in the course of his employment. The Court of Appeals found the medical report was competent evidence and sustained the trial tribunal.

■ This Court will uphold the decision of the Workers' Compensation Court if there is any competent evidence to support that decision.[2] Our review of the competence of the medical report is limited to facial non-compliance with the 1984 Guide.

■ The Workers' Compensation Act requires that a medical report which evaluates permanent impairment must comply with the 1984 Guide.[3] The claimant argues that the 1984 Guide requires the results of the $D_{co}$ test be included in the medical report before a rating of zero impairment can be given and the employer's medical expert failed to include the results of a $D_{co}$ test in the report which gave a rating of zero impairment.

■ The 1984 Guide, under the heading of personal and medical history, requires that the physician estimate the severity of dyspnea. The 1984 Guide also requires that the physician include cough and sputum production, wheezing, and environmental exposure, tobacco use and chronological occupational data in the history. Likewise, the 1984 Guide requires the physician record a number of other data such as blood pressure, heart and respiratory rates, the patients' breathing, and x-rays results. The medical expert should also evaluate the degree of dyspnea. However, the degree of dyspnea may not be the sole criteria for the evaluation of impairment.[4]

■ Step I of the physiologic testing specifically requires that a forced expiratory maneuver, or simple spirometry test, be "performed in all examinations of permanent impairment."[5] This test is used to measure the ventilatory capacity of the lungs. The three component parts of this test are: (1) the forced vital capacity (FVC), (2) the forced expiratory volume in the first second ($FEV_1$), and (3) the ratio of the first two measurements expressed as a percentage ($FEV_1$/FVC ratio). This maneuver should be performed as described in the 1978 ATS (American Thoracic Society) Epidemiology Standardization Project. To determine if the test results are within normal limits, the physician locates a predicated value from a chart (predicted value). Because there is a range of normal values, the value of the "95% Confidence Interval" must be subtracted from the predicated

1. American Medical Association, GUIDE TO THE EVALUATION OF PERMANENT IMPAIRMENT (2d ed. 1984).

2. *Parks v. Norman Mun. Hosp.*, 684 P.2d 548 (Okla.1984).

3. Okla.Stat. tit. 85, § 3(11) (Supp.1986).

4. 1984 Guide, *supra* note 1, at 85.

5. *Id.* at 87–88.

value. This result establishes the "normal" range. One of the above three measurements should be outside the normal range for the patient to be rated as impaired [6] if the spirometry test is used as the sole basis of the impairment rating.[7] It follows that if all three values are within the normal range and the sole resource for evaluating the impairment, then the patient's impairment could be rated as zero no matter what the results of the $VO_2$ and $D_{co}$ tests, indicating that the 1984 Guide did not intend to predicate a zero impairment rating on the $VO_2$ and $D_{co}$ tests being given. If the three measurements fall within the normal range or the severe impairment range, further testing is generally not required unless the claimant's respiratory complaints are of greater severity than the spirometry test results indicate.[8]

If the $FEV_1$ is less than 40% of the predicated value, the FVC is less than 50% of the predicated value, and the ratio is 40% of the predicated value, then the patient can be rated as severely impaired without further testing.[9] If the FVC, the $FEV_1$, and the ratio of the two are within the 95% confidence intervals, then the patient can be rated as having zero impairment unless the claimant asserts that he is unable to meet the demands of the job or he has not performed properly in the spirometry test. If the complainant's respiratory complaints are greater than the results of the spirometry test indicate, then the physician must proceed to Step II.[10]

■ Step II of the physiologic evaluation is the $D_{co}$ test.[11] Even though the Step I results are within the normal range, if the patient's respiratory complaints are inconsistent with that range, then the $D_{co}$ test must be given. It is within the physician's medical expertise to determine if the complaints are inconsistent with the spirometry results.[12] The 1984 Guide does not require the $D_{co}$ test as a prerequisite to a zero impairment rating in all circumstances.[13]

If the $D_{co}$ test is given and the results are less than 40% of the predicated value, then the patient may be rated as severely impaired without further testing.[14] If the result is equal to or greater than 40% of the predicated value, then the physician proceeds to Step III of the physiologic testing which is the estimated exercise capacity test (estimated $VO_2$ test).[15] The estimated $VO_2$ test involves the use of a treadmill or cycle ergometer and is not recommended for certain individuals.[16] Otherwise, the $VO_2$ test should be given when:

(1) an individual's spirometry *and* $D_{co}$ measurement are not within the 95% confidence interval for his or her age and height; OR (2) his or her spirometry *and* $D_{co}$ measurements do not indicate severe impairment as defined [by the 1984 Guide]; OR (3) the individual states that he or she is physically unable to meet the demands of a specific job because of breathlessness; OR (4) the individual has

**6.** *Id.* at 86 Table 1, and at 89.

**7.** *Orrell v. B.F. Goodrich,* 787 P.2d 848, 852 (Okla.1990).

**8.** 1984 Guide, *supra* note 1, at 97.

**9.** Guide, *supra* note 1, at 98 Figure 2.

**10.** *Id.* at 97. Under the 1988 Guide, "[t]he single breath $D_{co}$ should be used for the evaluation of all levels of impairment." American Medical Association, GUIDE TO THE EVALUATION OF PERMANENT IMPAIRMENT 112 (3rd ed. 1988) (1988 Guide).

**11.** The 1988 Guide provides: "The $D_{co}$ measures the amount of CO which diffuses across the alveolar-capillary membrane in a specified amount of time." 1984 Guide, *supra* note 1, at 97.

**12.** *Orrell,* 787 P.2d at 854.

**13.** *Id.* at 854; Guide, *supra* note 1, at 97, 98 Figure 2.

**14.** *Id.* at 89, 98 Figure 2.

**15.** 1984 Guide, *supra* note 1, at 98 Figure 2.

In the estimated exercise capacity test, a person is placed on either a treadmill or a cycle ergometer. The $VO_2$, or oxygen consumption per minute, is not measured directly but is determined through its relationship with power output, which is measured in kilopond meters/min (KPM/min). The power output is related to the grade and speed of the treadmill. *Id.* at 97.

**16.** *Id.* at 97.

not performed maximally or correctly in the spirometry or $D_{co}$ tests.[17]

■ The estimated $VO_2$ test is required if the spirometry and $D_{co}$ tests have been given and the results of both are not within specified ranges, the claimant states that he cannot perform a specific job because of breathlessness, or the claimant "has not performed maximally or correctly in the spirometry or the $D_{co}$ tests." The determination of whether the claimant has performed maximally or correctly is within the medical discretion of the doctor.[18] Otherwise, the estimated $VO_2$ test is not required.[19] If the physician has doubts about the accuracy of the estimated $VO_2$ test, then the measured exercise capacity (measured $VO_2$ test) should be administered. Even under the above circumstances, the $VO_2$ test should not be performed on a claimant who, "in the opinion of the examining physician, has medical contraindications to such test." [20]

Spirometry is the "gold standard" for determining obstructive lung disease because it detects the nature and extent of an obstruction.[21] Spirometry is also used for determining restrictive lung disease because it detects whether "lung volume or the volume of gas that can be moved per breath" is reduced and the extent of any reduction. The FVC and $FEV_1$ measurements, and the ratio of the two are the most useful indications of lung disfunction.[22] On the other hand the $D_{co}$ and the $VO_2$ test measurements may vary widely.[23]

■ The test schema for physiologic testing clearly indicates that when the $FEV_1$, the FVC and the ratio of the two are within the normal limits (the predicated value minus the 95% confidence interval) and the patient's respiratory complaints are consistent with those measurements, the physician is not required, under the 1984 Guide, to administer a $D_{co}$ test or a $VO_2$ test. As stated earlier, if the results of the $FEV_1$, the FVC, and the ratio of the two are within the normal range and consistent with the claimant's complaints, then the physician can give a classification of zero impairment, and it would be unnecessary to administer either of the other two tests. The 1984 Guide simply does not require a physician to always give the $D_{co}$ or the $VO_2$ test before giving a Class 1 zero impairment rating.

There have been four recent case in which the medical report has given a zero impairment rating without considering the $VO_2$ test. They are *Branstetter v. TRW/Reda Pump,*[24] *York v. Burgess–Norton Mfr. Co.,*[25] *Gaines v. Sun Refinery and Marketing,*[26] and *Orrell v. B.F. Goodrich.*[27]

*Orrell* was decided first. In *Orrell,* the employer's medical expert gave the claimant a zero impairment rating without performing the $D_{co}$ test. The $D_{co}$ test is generally given before the $VO_2$ is required as discussed above. *Orrell* held that it was not always necessary to give the $D_{co}$ before a zero impairment rating could be given. This Court recognized that the $D_{co}$ test

**17.** *Id.* (Emphasis added.) The 1988 Guide states:

> Testing to measure exercise capacity should not be done when an individual's spirometry and $D_{co}$ measurements indicate severe impairment. Measured exercise capacity testing *may* be done when (1) the individual's complaint of dyspnea is more severe than spirometry or $D_{co}$ would indicate; OR (2) the individual states that he or she is physically unable to meet the demands of a specific job because of breathlessness; OR (3) the individual has not performed maximally or correctly in the spirometry or $D_{co}$ tests.

1988 Guide, *supra* note 16, at 113–14 (emphasis added).

**18.** *See Id.* at 854.

**19.** 1984 Guide, *supra* note 1, at 97, 98 Figure 2.

**20.** 1984 Guide, *supra* note 1, at 97.

**21.** 4A Attorney's Textbook of Medicine ¶ 204A.31 (R. Gray 3rd ed. 1989).

**22.** *Id.* at ¶ 204.63.

**23.** 1984 Guide, *supra* note 1, at 97–98.

**24.** 809 P.2d 1305 (Okla.1991).

**25.** 803 P.2d 697 (Okla.1990).

**26.** 790 P.2d 1073 (Okla.1990).

**27.** 787 P.2d 848 (Okla.1990).

must be given if the results of the forced expiratory maneuver (the simple spirometry test) were within the normal range and the claimant's complaints were inconsistent with those results.

The decision as to whether such complaints *are actually* inconsistent or of greater severity than the more objective physiologic test results, so that the DCO test should be performed, under the 1984 Guides are within an area of medical expertise and are not generally subject to second guessing by a court. For all of the above reasons we perceive no error in [the doctor's] failure to perform a DCO test.[28]

After *Orrell*, this Court decided *Gaines* which held that the $VO_2$ test had to be given before the medical expert could rate a claimant at zero impairment. As discussed earlier, the 1984 Guide does not always require that a $VO_2$ test be given before a rating of zero impairment. To the extent that *Gaines* is inconsistent with this holding, it is rejected.

After *Gaines*, *York* was decided. In *York*, the claimant admittedly did not perform maximally or correctly in the spirometry test. The employer's medical expert did not employ the $D_{co}$ test or the $VO_2$ test. This court held that the expert's failure to conduct further tests was an impermissible deviation from the 1984 Guide. The 1984 Guide requires that the $VO_2$ test be performed when, *inter alia*, "the individual has not performed maximally or correctly in the spirometry or the $D_{co}$ tests." However, under *Orrell*, whether the individual performed maximally or correctly is subjective and, thus, within the expert's medical discretion.

The last of the four cases is *Branstetter*, which like *York*, involved a claimant who

admittedly did not perform maximally on the spirometry test. Consistent with *York*, this Court held that the $VO_2$ test had to be performed. Neither *Branstetter* nor *York*, like *Gaines*, required that the $VO_2$ test be given under *all* circumstances before a claimant could be rated as having zero impairment.

None of the factors which would require the examining physician to perform the $D_{co}$ test or the $VO_2$ test is present in this case as they were in *York* and *Branstetter*. The medical report was competent evidence supporting the trial tribunal's finding that there was no job-related, accidental injury. The trial tribunal's order is sustained.

CERTIORARI PREVIOUSLY GRANTED; COURT OF APPEALS' OPINION VACATED; ORDER OF WORKERS' COMPENSATION COURT SUSTAINED.

OPALA, C.J., and LAVENDER, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

SUMMERS, J., concurs in result.

ALMA WILSON and KAUGER, JJ., dissent.

OPALA, Chief Justice, concurring.

Today the court holds that in a *denied* workers' compensation claim for respiratory injury to which the Guides'[1] 1984 version applies, the medical expert's evaluation upon which a "zero impairment" rating is based need not include the "carbon monoxide diffusing capacity" test (or $D_{co}$). While I embrace today's pronouncement as a correct interpretation of the applicable Guides' requirements,[2] I concur in sustaining the claim's denial for the reasons expressed in Part I of my dissenting opinion in *Gaines v. Sun Refinery and Market-*

---

**28.** *Id.* at 854.

**1.** The term "Guides" refers to the American Medical Association's "Guides to the Evaluation of Permanent Impairment," whose second edition (or 1984 version) applies to this claim.

**2.** "The single breath $D_{co}$ should be performed when a patient has respiratory complaints that are of greater severity than the observed spirometry results would indicate." AMA Guides (2d

ed. 1984) at 97. The employer's medical report appears to contain no indication that this test was necessary. The physician had determined that the claimant's spirometry test results are consistent with the absence of complaints regarding shortness of breath with normal activities. This determination lies "within an area of medical expertise... not generally subject to second guessing by a court." *Orrell v. B.F. Goodrich*, Okl., 787 P.2d 848, 854 (1990).

*ing.*[3] For the reasons to be stated I am unable to join in the dissent which suggests that we invalidate legislation requiring physicians' use of the AMA Guides.

## I

In *Gaines,* as in this case, the claimant relied *solely* on the contention that the zero impairment rating given by the employer's doctor stems from an unexplained, and hence impermissible, deviation from the Guides. In neither case did the claimant question the trial judge's finding that no job-related injury had occurred. "This *alone* makes a discussion of a claimed deviation from the Guides purely academic and dehors the scope of issues tendered for review."[4] Indeed, "an assessment of permanent disability presupposes the existence of some on-the-job injury."[5]

## II

While I stand by my views in *Branstetter,*[6] where I expressed doubt about the constitutionality of the legislature's open-ended delegation to a private entity—the American Medical Association—of its standards-setting responsibility for evaluation of compensable physical impairment, I cannot today join the dissent calling for invalidation of the AMA Guides. A *sua sponte* review of a constitutional question which was neither advanced by the briefs nor preserved in the record goes beyond the limits of the *Reynolds v. Special Indemnity Fund*[7] exception. *Reynolds* teaches that if in a public-law controversy the aggrieved party's brief advances the wrong reason for reversal, the reviewing court is free *to grant corrective relief from the urged error on an applicable theory chosen sua sponte*—i.e., a theory that supports *the assigned error* but was neither advanced below nor on appeal and *is dispositive of the issue raised by the aggrieved party.* *Reynolds* is inapposite here. The reversible error of a constitutional dimension isolated by the dissent *sua sponte* was neither (a) assigned and argued by the aggrieved party, either here or below, nor does it (b) rest on a predicate clearly laid by the trial tribunal's record.[8] *Our Reynolds freedom to choose sua sponte the dispositive public-law theory when a wrong one is advanced does not extend to identifying a constitutional flaw*[9] *not urged by the aggrieved party either here or below, nor to supplying a deficiency for the trial tribunal's record.*[10] Unlike jurisdictional infirmities, into whose presence we must examine even when they are not urged upon us by the parties,[11] constitutional flaws may not be corrected in the appellate process *sua sponte.* The prudential rule of necessity, adhered to by all state and feder-

---

**3.** Okl., 790 P.2d 1073, 1082–1083 (1990) (Opala, V.C.J., dissenting).

**4.** *Gaines v. Sun Refinery and Marketing, supra* note 3 at 1083 (Opala, V.C.J., dissenting).

**5.** *Gaines v. Sun Refinery and Marketing, supra* note 3 at 1083 (Opala, V.C.J., dissenting).

**6.** *Branstetter v. TRW/Reda Pump,* Okl., 809 P.2d 1305, 1308 (1991) (Opala, C.J., concurring in result).

**7.** *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841, 842 (1948). *See Reynolds v. Special Indem. Fund,* Okl., 725 P.2d 1265, 1270 (1986), for application of the *Reynolds* public-law issue exception.

**8.** *Lewis Drilling Company v. Brooks,* Okl., 451 P.2d 956, 960 (1969); *Bostick Tank Truck Service v. Nix,* Okl., 764 P.2d 1344, 1349 (1988); *see Johnston Food Co. v. Monday,* Okl.App., 702 P.2d 62, 64 (1985); *Edwards v. AMOCO,* Okl.App., 776 P.2d 566, 569 (1989).

**9.** Extant case authority permitting review in a public-law controversy of a constitutional issue which was not dealt with below lends no support to the dissenting view. The constitutional flaw reached in those cases, though not urged in the trial tribunal, *was clearly assigned as error before the appellate court. See e.g.* Simons v. *Brashears Transfer and Storage,* Okl., 344 P.2d 1107, 1113 (1959); *First Nat'l Bank v. Southland Prod. Co.,* 189 Okl. 9, 112 P.2d 1087 (1941), citing *Magnolia Pet. Co. v. State,* 175 Okl. 11, 52 P.2d 81 (1935), *Shaffer Oil & Refining Co. v. County Treasurer,* 175 Okl. 6, 52 P.2d 76 (1935).

**10.** *See Muncrief v. Memorial Hosp. of So. Okl.,* Okl., 767 P.2d 400, 402 (1988); *Chamberlin v. Chamberlin,* Okl., 720 P.2d 721, 723–724 (1986).

**11.** This court must inquire *sua sponte* into its jurisdiction. *Cate v. Archon Oil Co., Inc.,* Okl., 695 P.2d 1352, 1356 (1985); *Pointer v. Hill,* Okl., 536 P.2d 358, 361 (1975).

al courts, commands that constitutional issues not be resolved in advance of strict necessity.[12]

### SUMMARY

In sum, though I stand by my views in *Branstetter*,[13] I concur in today's decision to sustain the order denying this claim "[b]ecause the employer's medical evidence supports the trial tribunal's finding that the claimant's injuries do not result from harm incurred in and about the working environment." [14]

SUMMERS, Justice, concurring in result.

The majority states that a physician *may* rate a patient as zero impaired without further testing when (1) the FVC, $FEV_1$, and $FEV_1/FVC$ are all normal, (2) the patient has performed the tests in the appropriate manner, (3) the patient's complaint's are consistent with such results, and (4) the patient has not stated that he or she is physically unable to meet the demands of a specific job because of breathlessness, citing the *Guides* at 86 Table 1, 97, and 98. This is a departure from one of our earlier conclusions in *Gaines v. Sun Refinery*, 790 P.2d 1073 (Okl.1990). Therein we noted that the Guides (Table 1 at P. 86) appeared to allow a finding of impairment based on positive results from any one of the three standards appearing therein: Dyspnea, *or* Tests of Ventilatory Function (FVC, FEV, $FEV_1/FVC$) *or* the $VO_2$ Max. If a finding of impairment could be based on positive results from *any* of the three, we reasoned that a finding of zero impairment would

have to be based on a showing of negative results from *all* of the three. Hence we concluded that the Guides required a negative $VO_2$ test to support a finding of zero impairment.

Our conclusion may have led to practical difficulties in the Compensation medical workplace. Apparently many physicians' offices where spirometry (ventilatory function) testing is done are not equipped to administer the $VO_2$. Also, it is clear that some claimants may not, for other health reasons, be safely placed on a treadmill or cycle ergometer, the device used in measuring the $VO_2$. *Guides,* P. 97. In any event, the majority now concludes our earlier reading of the *Guides* incorrectly overloaded the Respondent's physician, and I am prepared to accept the Court's repudiation of that facet of the *Gaines* opinion.

Claimant's principal objection here was that Respondent's doctor failed to administer the $D_{co}$ test.[1] The *Guides* describe the requirement for administering the $D_{co}$ thus: "The single breath $D_{co}$ should be performed when a patient has respiratory complaints that are of a greater severity than the observed spirometry results would indicate." We have explained that whether particular complaints do not correlate with the spirometry results so as to require a $D_{co}$ test calls for the exercise of medical discretion that we will not second guess. *Orrell v. B.F. Goodrich,* 787 P.2d 848 (1990). This holding recognizes that with any given normal spirometry and attendant patient complaints, one doctor may think a

---

**12.** *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *In Re Initiative Petition No. 347 State Question No. 639,* Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 (1975); *see also In re Initiative Petition No. 348,* Okl., 820 P.2d 772, 781, 782 n. 4 (1991) (Opala, C.J., concurring in result); *Johnson v. Walters,* Okl., 819 P.2d 694, 708, 712 n. 26 (1991) (Opala, C.J., concurring in part and dissenting in part); *State ex rel. Okl. Bar Ass'n v. Lobaugh,* Okl., 781 P.2d 806, 813 (1988) (Opala, J., dissenting); *In*

*Re Initiative Petition No. 341,* Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result).

**13.** *Supra* note 6.

**14.** *Gaines v. Sun Refinery and Marketing, supra* note 3 at 1083 (Opala, V.C.J., dissenting).

**1.** The $D_{co}$ test measures the amount of carbon monoxide that diffuses across the alveolar-capillary membrane in a specified amount of time. *Guides* at 97. Although the variability in the test is large compared to other tests the *Guides* state that the test is useful: "It is especially useful in detecting abnormalities that limit gas transference, such as interstitial fibrosis of the lung parenchyma." *Id.*

$D_{co}$ test is indicated while another doctor may not. Nothing in the record before us suggests that the employer's doctor was required to give the $D_{co}$ test. *See Orrell v. B.F. Goodrich, supra.*

I agree with the majority that the order of the Workers' Compensation Court is supported by competent evidence.

ALMA WILSON, Justice, dissenting.

If we are to be fair and consistent in our application of the workers' compensation law, the parties in this cause must be afforded 1) notice of the competency and probative value of the medical evidence and 2) opportunity to stand on the evidence adduced or to supplement the evidence. In this cause both the claimant and the employer offered medical reports to be admitted into evidence. Objections to the competency and probative value of each medical report were made at trial. The judge of the Workers' Compensation Court admitted the medical reports, taking the objections under advisement. The judge did not rule upon these objections. Rather, the judge entered an order denying the claim, setting forth only one finding—that the claimant suffered no accidental injury arising out of and in the course of employment—and only one ruling—that compensation is denied.[1]

The claimant appealed, challenging the competency and probative value of the employer's medical report. Victorious in the trial court, the employer did not challenge the claimant's medical report on appeal. Upon review in the Court of Appeals and in this Court, claimant today has notice that the employer's medical report constitutes

competent, probative evidence and is sufficient to support a denial of the compensation claim. However, unless this cause is remanded, claimant will never be given notice of the legal sufficiency of his medical evidence, nor will he be afforded an opportunity to supplement or replace his medical evidence.

We have recently remanded several workers' compensation claims for further proceedings because of failure of medical proof. In *Houston v. Zebco,* 821 P.2d 367, 62 O.B.J. 3662 (Okla.1991), the trial court ruled that claimant's medical evidence was incompetent and wholly without probative value. We agreed with the trial court, but remanded for further trial proceedings because the trial judge should have afforded claimant an opportunity to stand on her incompetent medical report or supplement it prior to denying compensation. In *Branstetter v. TRW/Reda Pump,* 809 P.2d 1305 (Okla.1991), the claimant objected to the employer's medical evidence, but the trial court denied the claim. On appeal, both the Court of Appeals and this Court found that the employer's medical evidence was not competent, probative evidence. The cause was remanded for new trial. In *York v. Burgess–Norton Manufacturing Company,* 803 P.2d 697 (Okla.1990), the trial judge found the claimant's medical evidence was not competent. The claimant appealed. We found that the employer's medical evidence was not competent and remanded for a new trial. In *Gaines v. Sun Refinery and Marketing*[2], objections were made at trial to all medical evidence. The trial court took these objections under

1. Any attempt to arrive at a conclusion as to the evidence considered by the trial court would be mere speculation. The record on appeal does not reveal whether the trial court considered either medical report or whether the trial court determined both medical reports to be competent and probative, allowing greater weight to the employer's medical report.

2. 790 P.2d 1073 (Okla.1990). In Part I. of *Gaines,* this Court held that a medical report evaluating a claimant's respiratory impairment at 0% does not facially comply with the 1984 A.M.A. Guides to the Evaluation of Permanent Impairment and is not competent evidence unless the report shows that "three tests [are required to] confirm that an examinee fits that category (Class one)...." *Id.,* at p. 1076. Un-

der Part I., the employer's medical report in the instant cause is not competent evidence. I do not join in today's overruling of Part I. of *Gaines.* However, if it is to be overruled, it should be overruled with prospective application. *Gaines* was mandated May 4, 1990. Certiorari was granted in this cause on December 4, 1989.

In Part II. of *Gaines,* we held that objections to evidence offered at trial before the Workers' Compensation Court must comply with the specificity requirements of 12 O.S.1981, § 2104. Noting departure from clear past precedent, we announced prospective application of this holding. This holding contemplates that the judge of the Workers' Compensation Court will rule on the specific objections and the parties may

advisement. The trial court then denied the claim finding no work-related injury, as in the case at bar. The claimant appealed. We found all the medical evidence incompetent and remanded for further proceedings to allow the parties an opportunity to present further competent evidence as is necessary to definitely settle the claim. In *Zebco v. Houston*, 800 P.2d 245 (Okla.1990), claimant appealed the trial court's ruling that her medical evidence has no probative value. We agreed with the trial court, but remanded for further trial proceedings to allow the claimant another opportunity to prove her compensation claim. And, in *Wheat v. Heritage Manor*, 784 P.2d 74 (Okla.1989), the employer, in imprecise terms, objected to the probative value of the claimant's medical evidence. The trial court implicitly resolved the objection in favor of the employer. A three-judge panel affirmed. The Court of Appeals reversed, finding the claimant's medical evidence is competent. We found the claimant's medical evidence to be without probative value and remanded with directions to allow claimant an opportunity to stand on her medical evidence or substitute another evaluation for the flawed medical report.[3]

Affording a claimant another opportunity to present competent, probative medical

---

then preserve the objection for appellate review. The objections made at trial herein were general in nature, based on a failure to comply with the AMA Guidelines. Even so, the Workers' Compensation Court judge should have ruled on the objections with notice of the rulings given to each party.

And, in Part III. of *Gaines*, we overruled our "jackpot" rule in *LaBarge v. Zebco*, 769 P.2d 125 (Okla.1989) and *Perlinger v. J.C. Rogers Construction Co.*, 753 P.2d 905 (Okla.1988). We reasoned that it would be inconsistent to reward litigants who remain silent at trial, but then successfully nullify the victorious opposition's only medical evidence on appeal. In this cause, the trial court's failure to rule on the objection to claimant's medical evidence has effectively nullified claimant's right to appeal and another opportunity to present competent, probative medical evidence.

3. The transcript of the proceeding in Tulsa, Oklahoma, before the Honorable Ozella M. Willis, Judge of the Workers' Compensation Court, on October 19, 1988, does not support the statement in the majority opinion that Judge Willis "... ruled on the objections by admitting both reports without reservation and did not withdraw the admission." In compensation law, this Court has separated the issues of admissibility and probative value of evidence. See, *Whitener v. South Central Solid Waste Authority*, 773 P.2d 1248, 1249, note 1 (Okla.1989), distinguishing a probative value objection from an admissibility objection. *Whitener* requires Judge Willis to rule on the objections to the probative value of the medical evidence even though the medical evidence has been admitted. Judge Willis did not rule on the probative value objections. The transcript, at pages 20–24 reads:

THE COURT: Mr. Doty do you have anything else?

MR. DOTY: Yes, Your Honor, we would introduce the deposition of Dr. G.C. Miller which was taken on December 2, 1987.

THE COURT: Claimant's 1 is a deposition of Dr. G.C. Miller taken on the 2nd day of December, '87; any objections?

MR. GEE: Yes, Your Honor, competency and probative value. The competency objection, Your Honor, goes to the fact he admits his spirometer did not comply with the ATS standards and therefore the AMA Guidelines. The probative questions—

THE COURT: Just a minute. Are you talking about the medical report or is this in the deposition proper?

MR. GEE: In the deposition where he admits that the spirometer did not comply.

THE COURT: Do you have a page number on that?

MR. GEE: Let me find that real quick, Your Honor. I'm sorry, I should have made a note on that. I made a note on one of the others. Okay, Your Honor, page 6.

THE COURT: All right.

MR. GEE: I would also call to the Court's attention—this is a probative objection, Your Honor; page 10 of the deposition the answers that the doctor gave in regard to the cigarette smoking and the industrial exposure.

THE COURT: Page 10?

MR. GEE: Of the deposition. The answers that the doctor gave to our questions about the cigarette smoking and the industrial exposures; it's strictly a probative.

THE COURT: I'll read it, sir.

MR. GEE: I would call to the Court's attention that even though Dr. Miller attempted to evaluate upper airway impairment he admits that the ears, nose, the nose and throat were within normal limits and his report reflects that.

THE COURT: What kind of objection is that, Mr. Gee?

MR. GEE: It's primarily a probative in that he admits that there's no objective pathology to the nose and throat.

THE COURT: Talking about the medical now?

MR. GEE: Yes, ma'am, the medical report itself reflects there's no pathology.

THE COURT: You may respond if you care to, Mr. Doty. You don't have to.

evidence is in keeping with the spirit of the workers' compensation laws and notions of fairness.[4] Ronnie Davis should be afforded another opportunity to support his claim for workers' compensation. Accordingly, I respectfully dissent.

KAUGER, Justice, dissenting:

Because the Legislature is constitutionally precluded from delegating its legislative

MR. DOTY: Your Honor, the Doctor states he did his state [report] according to the American Thoracic Society's; also I would note on page 6, the only reason his machine did not comply with the, with the American Thoracic Society's standards is that his spirometer did not have a printout; it was just a digital.
THE COURT: Is not the digital acceptable, Mr. Gee?
MR. GEE: The ATS standards, and he admits that the ATS standards which are called for in the AMA Guidelines, require producing a printout.
THE COURT: I'll read all that and take it under consideration. Anything else, Mr. Gee? Are those all your objections?
MR. GEE: Yes, I'm sorry.
(Claimant's Exhibit No. 1 admitted.)
THE COURT: Anything else, Mr. Doty?
MR. DOTY: We rest.
THE COURT: All right, Mr. Gee.
MR. GEE: If the Court please: We would ask that the Court mark Dr. Mahaffey's medical report of November 25th, 1987 as an exhibit and be introduced into evidence.
THE COURT: Respondent's 1 is a medical report dated November the 25th, 1987 from Dr. Mahaffey; any objections?
MR. DOTY: Yes, Your Honor, I object to the report that it's incompetent and lacks probative value. I object to it that it does not comply with the AMA Guides and that it's speculative.
THE COURT: Where does it not comply to the AMA Guides?
MR. DOTY: He did not give a D.C.O. test; since Mr. Gee's brought up the ATS standards I note that the Doctor doesn't give any spirometric printout in this evaluation and I don't believe he complied with Table 5, page 160 in his evaluation of the upper airways. But that would be a probative value in that.
THE COURT: Okay. Do you have a response, a brief response?
MR. GEE: Yes, ma'am, very brief. Dr. Mahaffey's machine does produce a printout and it is in compliance with the ATS standards. He did not attach it. If he wanted it attached all he had to have done was ask us and we could have provided it to him.
THE COURT: Why didn't you attach it though?
MR. GEE: It wasn't sent to me whenever it came to me and whenever he has cross examined Dr. Mahaffey he's asked for them and

duties to private parties,[1] I dissent from the majority's opinion which gives efficacy to the American Medical Association's "Guides to the Evaluation of Permanent Impairment" (AMA Guides).

This Court is required by 12 O.S.1981 § 2201 to take judicial notice of the constitution.[2] Courts are required to consider all applicable constitutional, statutory, and de-

we've always provided them. He is aware of the fact that his machine does produce a printout.
MR. DOTY: No, I'm not. I have never cross examdined [sic] Dr. Mahaffey.
MR. GEE: Okay, somebody over at your office has.
THE COURT: I'll go ahead and admit it.
(Repondent's Exhibit 1 admitted.)
THE COURT: Anything else, gentlemen? Is this case submitted?
MR. GEE: Case submitted as far as we are concerned, Your Honor.
THE COURT: Thank you, you may be excused.
(End of Proceedings.)

4. The intended results of our workers' compensation laws are to provide a "workable means of securing compensation to injured employees and to have industry bear its burden of the wear and tear on the human machine or man power." *Smith & McDannald v. State Industrial Commission*, 133 Okl. 77, 271 P. 142, 143 (1928). [Emphasis added.] To accomplish these results, the workers' "compensation laws should be construed fairly, indeed liberally, in favor of the injured workman...." *Stasmos v. State Industrial Commission*, 80 Okl. 221, 195 P. 762 (1921). [Emphasis added.]

1. *American Home Prod. Corp. v. Homsey*, 361 P.2d 297, 301 (Okla.1961); *Potter v. State*, 509 P.2d 933, 935 (Okla.Ct.Crim.App.1973). The Okla. Const. art. 4, § 1 provides:
"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."
The Okla. Const. art. 5, § 1 provides in pertinent part:
"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives..."

2. Title 12 O.S.1981 § 2201 provides in pertinent part:
"A. Judicial notice shall be taken by the court of the common law, constitutions and

cisional law applicable to a cause.[3] Since this Court's decision in 1941 in *First Nat'l Bank v. Southland Prod. Co.*, 189 Okl. 9, 112 P.2d 1087, 1098–99 (1941), we have recognized the importance of considering a constitutional question for the first time on appeal if the public welfare and interest so require:

> "Thus where questions of public policy or widespread public interest are involved an appellate court may review a cause on a theory not presented in the trial tribunal. *Magnolia Pet. Co. v. State*, 175 Okl. 11, 52 P.2d 81; *Shaffer Oil & Ref. Co. v. County Treasurer of Creek County*, 175 Okl. 6, 52 P.2d 76. See also 3 Am.Jur. 35. The wisdom of this exemption is, we think, self-evident, for the rule itself is one of practice and designed to limit the scope of inquiry on appeal strictly to the controversy as it was presented to the lower tribunal. It is fair to the parties, however, when the question is of such a nature that the present welfare of the people at large, or a substantial portion thereof, is involved that the consideration of their rights merits a departure from the general rule and authorizes the court in its discretion to direct its attention to the general welfare, rather than the interests of the parties to the immediate cause."

The repeated presentation of the applicability of the AMA Guides in workers' compensation causes and the fact that employers as well as employees rely upon the workers' compensation system for protection for on-the-job injuries warrants consideration of the constitutional question presented. Additionally, at least two recent opinions indicate that the issue is a recurring one—*Dosh v. TRW/REDA Pump*, 810 P.2d 1283, 1284 (Okla.1991) and *Branstetter v. TRW/REDA Pump*, 809 P.2d 1305, 1310 (Concurring in result opinion by Opala, C.J.).

*DELEGATION OF THE AUTHORITY TO DETERMINE PERMANENT IMPAIRMENT PURSUANT TO 85 O.S.SUPP.1984 § 3(11) TO A PRIVATE ENTITY IS AN UNCONSTITUTIONAL DELEGATION OF THE LEGISLATIVE AUTHORITY.*

The Legislature enacted the Workers' Compensation Act, 85 O.S.1981 § 1 et seq., to provide a comprehensive system of compensation for workers, employed by participating employers, who are injured in the course of their employment.[4] It replaced the often large but erratic damage awards available through common law negligence actions with a relatively quick and predictable statutorily set recovery for injuries sustained in the course of employment without regard to fault.[5] Pursuant to 85 O.S.Supp. 1990 § 3(11),[6] a medical report evaluating

---

public statutes in force in every state, territory, and jurisdiction of the United States...."

**3.** See, *Eason Oil Co. v. Uhls*, 518 P.2d 50–51 (Okla.1974).

**4.** Title 85 O.S.Supp.1985 § 11 provides in pertinent part:

"Every employer subject to the provisions of the Workers' Compensation Act shall pay, or provide as required by the Workers' Compensation Act, Compensation according to the schedules of the Workers' Compensation Act for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment, without regard to fault as a cause of such injury ...."

**5.** *Miller v. Sears, Roebuck & Co.*, 550 P.2d 1330, 1334 (Okla.1976), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

**6.** Title 85 O.S.Supp.1990 § 3 provides in pertinent part:

"As used in the Workers' Compensation Act:

... (11) 'Permanent impairment' means any anatomical or functional abnormality or loss after reasonable medical treatment has been achieved, which abnormality or loss the physician considers to be capable of being evaluated at the time the rating is made. Except as otherwise provided herein, any examining physician shall only evaluate impairment in accordance with the latest publication of the American Medical Association's 'Guides to the Evaluation of Permanent Impairment' in effect at the time of the incident for which compensation is sought. However, revisions to the guides made by the American Medical Association which are published after January 1, 1989 shall be operative one hundred twenty (120) days after the last day of the month of publication. The examining physician shall not follow the guides based on race or ethnic origin, but otherwise shall not deviate from said guides except as may be specifically provided for in the guides. These officially adopted guides shall be the exclusive basis for testimony and conclusions with regard to permanent impairment with the exception of

permanent impairment must comply with the AMA Guides. Any deviation from the AMA Guides must be specifically provided for by the AMA Guides.

The governmental powers are allocated among three branches of government—the legislative, the executive, and the judicial.[7] The authority of each of the three branches must be jealously guarded to prevent centralization of power in any one department. It has long been recognized that the Legislature may not delegate authority primarily legislative in character.[8] Delegation of the legislative power to private entities is forbidden.[9]

Section 3(11) vests in a purely private organization, the American Medical Association, the unbridled authority to set standards for permanent impairment which govern an employee's right to collect compensation for on-the-job injuries. This delegation is made *without guides, restrictions or standards.* It has resulted in the requiring of often unnecessary but expensive tests which increase the cost of the system, the cost of workers' compensation insurance, the cost of doing business, and the cost of products to the ultimate consumers. The Legislature may not delegate the legislative power to a privately controlled national organization.[10] Section 3(11) is unconstitutional because it vests

the American Medical Association with the authority to determine the standards for the evaluation of permanent impairment—a power reserved to the Legislature acting in its law making capacity.

---

paragraph 3 of Section 22 of this title, relating to scheduled member injury or loss; and impairment, including pain or loss of strength, may be awarded with respect to those injuries or areas of the body not specifically covered by said guides...."

Section 3(11) has been revised since the instant cause was filed. However, the controlling statute, 85 O.S.Supp.1986 § 3(11) also requires evaluations in accordance with the American Medical Association "Guides to the Evaluation of Permanent Impairment".

7. The Okla. Const. art. 4, § 1, see note 1, supra.

8. *Sterling Refining Co. v. Walker,* 165 Okl. 45, 25 P.2d 312, 318 (1933); Annot., "Permissible Limits of Delegation of Legislative Power," 79 L.Ed. 474, 476 (1935). Only those administrative functions incidental to the implementation of the legislative intent may be vested in other bodies. These functions must be accompanied by well-defined limits prescribed by the Legislature. *Herrin v. Arnold,* 183 Okl. 392, 82 P.2d 977, 982, 119 A.L.R. 1471, 1479 (1938); *Sterling*

*Refining Co. v. Walker,* see this note, supra; *Potter v. State,* see note 1 at 934, supra. The Workers' Compensation Act provides no limits or parameters to the medical profession for inclusion or direction in the promulgation of the AMA Guides.

9. *American Home Prod. Corp. v. Homsey,* see note 1; *Potter v. State,* see note 1, supra; Annot., "Delegation of Legislative Power to Nongovernmental Agencies as Regards Prices, Wages, and Hours," 3 A.L.R.2d 188, 191 (1949). In *Homsey,* we struck down as an unlawful delegation of legislative power the Oklahoma Fair Trade Act, 78 O.S.1951 § 41 et seq., because it delegated to private persons the right to prescribe a rule governing conduct for the future which bound nonconsenting parties. In *Potter,* the Oklahoma Court of Criminal Appeals found that the Legislature's delegation to a private entity of the right to determine what motion pictures could be distributed in Oklahoma was an unconstitutional delegation of the legislative authority.

10. *Potter v. State,* see note 1, supra.